[No. 20412–2–I.    Division One.    August 22, 1988.]

WILLIAM L. GRANSTON, ET AL, *Appellants,* v. GAIL LEE CALLAHAN, ET AL, *Respondents.*

*Frank W. Payne* and *Payne & Verzani*, for appellants.

*Ted D. Zylstra* and *Zylstra, Beeksma, Waller, & Skinner*, for respondents.

SCHOLFIELD, C.J.—The plaintiff William L. (Bill) Granston appeals from a judgment in a quiet title action establishing an easement by prescription in favor of the defendant, Gail Lee Callahan.

## FACTS

In about 1935, two brothers, William R. Granston and Edward L. Granston, acquired adjacent parcels of waterfront property on Camano Island. The two tracts remained undeveloped for more than a decade. The plaintiff, Bill Granston, is William R. Granston's son. The defendant, Gail Callahan, is Edward L. Granston's daughter. In the late 1940's, with the help of his brother William and his nephew Bill, Edward Granston built a permanent home on

his tract and occupied that home as his residence until his death in 1982.

A very strong bond existed between William and Edward Granston. Bill Granston testified:

A very, very exceptionally strong bond existed between my father and his brother, Edward. . . . They were as close as two brothers could conceivably be in all aspects of life. They were—they shared everything, had complete confidence and trust in each other. . . .

. . .

. . . As I discussed earlier, this relationship, to my knowledge today, is unique and a desirable thing. I wish I had a relationship with another relative or friend to the degree this existed. There was a sense of total cooperation and trust in the usage and the availability of each other's physical items up there and the real property itself was unlimited [remainder of answer stricken by the court].

In addition to building the permanent home, Edward Granston, with the assistance of his brother, also constructed a barn and a corral for horses. The barn was not initially built as a permanent structure. It was located on both sides of the property line dividing the two properties. They also installed an underground fuel storage tank, a concrete walkway to the beach and a concrete driveway. Although they knew where the boundary between the properties was located, the brothers placed these improvements in the most convenient location from the standpoint of taking advantage of natural slopes and level areas, and thus, such improvements are, in part, located on the property now belonging to Bill Granston. The driveway, which was also a joint effort, was placed entirely on Bill Granston's property. Later Edward, William and Bill Granston built a house on William's property.

Bill Granston testified that Edward Granston never attempted to exercise dominion and control over any of the areas to the exclusion of Bill's father. William and Edward Granston and their families had free access to each other's property, including the physical improvements such as the

homes, the garage, the garden, the driveway, the walkway and the area around the walkway, the gas pump, the barn, and the corral.

In respect to mutual use and access to the properties involved, Bill Granston testified:

My father and/or myself had free and unencumbered access to all of the property that legally is described as my father's and/or now my property, but to go further we had free and open and unhindered access to all of Edward Granston's property, including the physical improvements such as house, barn, garage and everything else, and it would have been insulting to either one of those gentlemen if anything else would have been suggested.

Bill Granston testified that each of the brothers had "free license" to use each other's property.

Bill Granston acquired title to his father's property in the early 1960's. His father, William Granston, died in 1974. Gail Callahan acquired title to her father's property upon his death in 1982 and continued to occupy that property as her residence.

On May 1, 1971, Bill Granston and his wife, as grantors, executed an agreement for permissive use with Edward and Violet Granston. The agreement referred to the driveway and walkway and provided in part as follows:

The parties agree that the use of the driveway and walkway shall be deemed to be with the permission of the Grantors and shall be continued with the express license and permission of the Grantors provided, however, that such license shall not by the lapse of time or otherwise ripen into any other right, and provided further that the license granted hereby shall be personal and shall not become appurtenant to, run with or be a burden upon either parcel of land, and shall terminate upon the death of either of the Grantors or the Grantee, Edward L. Granston, or sooner upon the sale or other alienation by either party of their respective parcels of property.

Exhibit 1. All signatures were acknowledged before a notary public.

In September 1986, Bill Granston filed suit to enjoin Callahan from further use of the driveway and walkway and to require her to remove all offending structures or improvements, including the barn, the gas tank, and sections of the concrete driveway and walkway physically located on the plaintiff's property. Callahan filed a counterclaim seeking to quiet title to the disputed areas by adverse possession.

The case was heard in a bench trial on February 11, 1987. A letter decision was rendered dated March 11, 1987, in which the trial court found that there was a mutual use of the disputed areas and improvements by the two brothers "under a claim of right which was adverse to the separate and exclusive right of the other." Finding of fact 10. The judgment and decree awarded Callahan a prescriptive right to use the driveway and walkway to the beach, together with that part of Granston's property which lies between the true property line and the walkway, and a nonexclusive prescriptive right to use that portion of Granston's property between the driveway and the true property line upon which is situated the barn, corral, garden, gas pump and gas tank. The judgment and decree further awarded Bill Granston a nonexclusive prescriptive right to use those portions of Callahan's property on which is situated the corral, barn, garden, gas pump and gas tank.

Bill Granston appeals from that part of the judgment and decree awarding Callahan a prescriptive right for continued use of the driveway, walkway, garden, barn and corral areas on his side of the property line.

### USE REQUIRED FOR PRESCRIPTIVE RIGHT

While prescriptive rights are not favored in the law, a prescriptive easement may be acquired by proof of an adverse use known to the owner or conducted in an open, notorious and continuous manner for 10 years. *Chaplin v. Sanders,* 100 Wn.2d 853, 676 P.2d 431 (1984); *Smith v. Breen,* 26 Wn. App. 802, 804, 614 P.2d 671 (1980).

Adverse user is such use of property as the owner himself would exercise, entirely disregarding the claims of others, asking permission from no one, and using the property under a claim of right. Hostile use of real property by an occupant or user does not import ill will, but imports that the claimant is possessing or using it as owner, in contradistinction to possessing or using the real property in recognition of or subordinate to the title of the true owner.

*Malnati v. Ramstead,* 50 Wn.2d 105, 108, 309 P.2d 754 (1957).

In *Chaplin v. Sanders, supra,* the Washington Supreme Court further defined the meaning of hostility in the adverse possession context at pages 860–61 as follows:

The "hostility/claim of right" element of adverse possession requires only that the claimant treat the land as his own as against the world throughout the statutory period. The nature of his possession will be determined solely on the basis of the manner in which he treats the property. His subjective belief regarding his true interest in the land and his intent to dispossess or not dispossess another is irrelevant to this determination.

(Footnote omitted.)

While this definition may work well in cases where the only issue is whether the use was adverse, it would appear to have very little practical application in cases such as the one before us today, where the commencement of the use was clearly permissive. Where the use is permissive, the user will normally occupy and use the land in the manner of a true owner. Thus, evidence of such manner of use is not helpful in resolving permissive use cases.

In the *Chaplin* opinion, the court states at pages 861–62:

[P]ermission to occupy the land, given by the true title owner to the claimant or his predecessors in interest, will still operate to negate the element of hostility. The traditional presumptions still apply to the extent that they are not inconsistent with this ruling.

In so stating, the *Chaplin* court made it clear that a different set of rules applies when the initial use is permissive.

## PERMISSIVE USE

■ Those rules are well stated in *Northwest Cities Gas Co. v. Western Fuel Co.,* 13 Wn.2d 75, 84, 123 P.2d 771 (1942) as follows:

> When one enters into the possession of another's property there is a presumption that he does so with the true owner's permission and in subordination to the latter's title.
>
> A user which is permissive in its inception cannot ripen into a prescriptive right, no matter how long it may continue, unless there has been a distinct and positive assertion by the dominant owner of a right hostile to the owner of the servient estate.

(Citations omitted.)

Permission is defined in Black's Law Dictionary 1298 (4th ed. 1968) as:

> A license to do a thing; an authority to do an act which, without such authority, would have been unlawful.

Permission can be express or implied, and a use which is initially permissive cannot ripen into a prescriptive right unless the claimant makes a distinct and positive assertion of a right hostile to the owner. *Roediger v. Cullen,* 26 Wn.2d 690, 175 P.2d 669 (1946); *Crites v. Koch,* 49 Wn. App. 171, 177, 741 P.2d 1005 (1987).

■ The inference of permissive use is applicable to any situation in which it is reasonable to infer that the use was permitted by sufferance and acquiescence. It is not necessary that permission be requested. *Cuillier v. Coffin,* 57 Wn.2d 624, 626, 358 P.2d 958 (1961); *Roediger v. Cullen, supra* at 707; *Crites v. Koch, supra* at 177. A finding of permissive use is supported by evidence of a close, friendly relationship or a family relationship between the claimant and the property owner. Stoebuck, *The Law of Adverse Possession in Washington,* 35 Wash. L. Rev. 53, 75 (1960).

> A friendly relationship between parties is a circumstance more suggestive of permissive use than adverse use and the trial court was free to find use was permitted as neighborly courtesy.

*Miller v. Jarman,* 2 Wn. App. 994, 997, 471 P.2d 704 (1970).

In *Pickar v. Erickson,* 382 N.W.2d 536, 538 (Minn. Ct. App. 1986), the court declined to find adverse use, stating as follows:

> There is at least an inference, if not a presumption, that a use is permissive where the owners of the two estates have a close family relationship. This inference of a permissive use applies in this case where one brother bought property adjoining his two brothers' property.

(Footnote and citations omitted.)

The facts of the case before us demonstrate a clear, almost indisputable, case of permissive use. The brothers Granston worked together in building the driveways, walkways and other improvements that served both properties. Their affection for each other and completely open, cooperative, and trusting lifestyles were completely consistent with an implied permission by each to the other to use his property and the improvements freely.

A finding of permissive use is supported not only by a presumption of permissive use under these circumstances, but also by the fact that improvements were made on both properties for reasons of convenience completely uninfluenced by the location of the property line dividing the properties.

The facts of this case provide no support for the conclusion of law made by the trial court that each was operating under a claim of right that was adverse to the ownership of the other such that uninterrupted use over a 10–year period could ripen into a prescriptive right.

■ A permissive use necessarily terminates when the licensor dies or alienates the servient estate. The grant of permission being personal to him, it cannot continue beyond his termination of ownership.

> [A] change in the title and ownership of the alleged servient estate operates as a revocation of a permissive use previously granted and such use may then become adverse and ripen into an easement.

(Footnote omitted.) 2 G. Thompson, *Real Property* § 345, at 241–42 (1980).

Bill Granston acquired title to his father's property in 1962. Approximately 9 years had passed at the time he and his wife entered into the agreement for permissive use on May 1, 1971. That agreement, however, tolled the statute of limitations on any adverse use claim by Callahan.

### AGREEMENT OF MAY 1, 1971

On the ground that it was not supported by consideration, the trial court held that the agreement of May 1, 1971, was invalid and unenforceable. The trial court's reasoning was that since Edward had a prescriptive easement, the agreement gave him no benefit he did not already have.

■ Our conclusion that Edward's easement was a permissive easement defeats Callahan's claim of lack of consideration. We hold the agreement of May 1, 1971, is valid and enforceable. Each of the parties to the agreement agreed to termination of his permissive easement upon the death of either party or upon sale of either property. Each had the benefit of the permissive easement until termination pursuant to the terms of the agreement. Thus, the agreement operated to grant mutual benefits to both parties. A benefit to the promisor or a detriment to the promisee, or mutual benefits or mutual detriments constitute sufficient consideration for a contract. 17 Am. Jur. 2d *Contracts* § 96 (1964); *Weaver v. King Cy.*, 73 Wn.2d 183, 190, 437 P.2d 698 (1968) (Hale, J., dissenting).

A permissive easement can be terminated by a valid revocation[1] of the permission, and both parties to this agreement had the power to terminate the use of his property by the other at the time the agreement was executed. The agreement applies to the driveway and walkway only.

---

[1]We refer to a valid revocation because there are cases where permissive uses are controlled by oral or written agreements. In those cases, termination is usually controlled by the terms of the agreement.

## CONCLUSION

The trial court held that each party had a nonexclusive prescriptive easement to use that portion of the corral, barn, garden and gas tank located on the property of the other. Those areas were not affected by the agreement.

Callahan's use of improvements located on Bill Granston's property became adverse in 1962 and has now ripened into a prescriptive right except for the driveway and walkway. Her adverse use of the driveway and walkway was interrupted by the May 1, 1971, agreement, making use of the driveway and walkway permissive only.

The portion of the judgment granting Callahan a prescriptive right to use the driveway and walkway is reversed.

The trial court's judgment granting to Callahan a nonexclusive prescriptive right to use those portions of the corral, barn, garden and gas tank on Bill Granston's property is affirmed.

So far as Bill Granston's use of those portions of the corral, barn, garden and gas tank located on Callahan's property is concerned, the judgment granting Granston a nonexclusive prescriptive right to continue use thereof must be affirmed. Callahan has not cross–appealed that portion of the judgment.

This case is remanded to the trial court for entry of a judgment consistent with this opinion.

GROSSE and WEBSTER, JJ., concur.