[No. 39448-7-I.   Division One.   August 10, 1998.]

BRUCE MILLER, ET AL., *Respondents,* v. O. LOWELL ANDERSON, ET AL., *Appellants.*

---

824

*Robert E. Ordal* of *Ordal & Jones*, for appellants.

*Daryl A. Deutsch* of *Rodgers & Deutsch*, for respondents.

ELLINGTON, J. — This case involves a dispute over the boundary between two adjacent parcels of property bordering Lake Washington, and requires us to examine the doctrine of adverse possession in the context of permissive use and successors in title.

## Summary

Merle and Doris Shaw (the Shaws), owners of the north lot, and Ernest Tuttle, owner of the south lot, recognized that the fence between their lots diverged from the platted line such that Mr. Tuttle was using the Shaws' property. In 1968, they entered into and recorded a formal agreement, accepting the platted line as the true boundary. The Shaws did not move the fence, however, and allowed Mr. Tuttle and subsequent owners of the south lot to continue to use their property on the south side of the fence. In 1973, Mr. Tuttle sold the south lot to David and Marcella Clark (the Clarks); they in turn sold in 1986 to Bruce and Pam Miller (the Millers). The Shaws owned the north lot until 1986, when they sold to O. Lowell Anderson and Laurie Baker (Anderson/Baker). After Anderson/Baker had a survey done in 1991, a dispute over the true property line arose between Anderson/Baker and the Millers. The trial court quieted title in the Millers on a theory of adverse possession, concluding that Mr. Tuttle's use was permissive, but that permission was revoked as a matter of law upon Mr. Tuttle's 1973 sale to the Clarks, and that Anderson/Baker failed to prove that the Clarks' or the Millers' use was permissive.

We reverse. Use that is permissive at its inception is presumed to remain permissive unless proof exists of (1) a change in use beyond that permitted, providing notice of hostility to the true owner, or (2) the sale of the servient estate. Mr. Tuttle's sale of the dominant estate did not terminate the permissive use, and did not shift the burden to Anderson/Baker to prove continued permission. The permissive use did not end by operation of law until the Shaws' 1986 sale of the servient estate to Anderson/Baker. The Millers had the burden to prove that the permissive use in fact ended sooner. They presented no evidence to satisfy this burden, and thus failed to establish adverse use for the statutory period. We therefore remand for the court to quiet title in Anderson/Baker.

## Facts[1]

When Merle and Doris Shaw purchased the north lot in 1951, it was fenced on its south side from the street to the lake. In the late 1960s, the Shaws realized that the correct boundary was south of the original fence. No formal survey was done. In 1968, the Shaws and Ernest Tuttle entered into and recorded a boundary line agreement, accepting the platted line as the boundary between their properties. But the Shaws did not want to move the fence, and permitted Mr. Tuttle to continue to maintain the property up to the fence. Mr. Tuttle's use of the property was essentially border landscaping.

In 1973, Mr. Tuttle sold the south lot to David and Mar-

---

[1]The trial court's findings are unchallenged; therefore, they are verities on appeal. *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 808, 828 P.2d 549 (1992). Some of the findings are in the court's conclusions, but we examine them for what they are regardless of their label. *See Willener v. Sweeting*, 107 Wn.2d 388, 394, 730 P.2d 45 (1986) (appellate court reviews erroneously designated findings and conclusions for what they are). The Millers challenge the finding that Tuttle's use was permissive, but we do not consider that issue because they failed to cross-appeal it. *See* RAP 5.1 (party seeking appellate review must file notice of appeal). Nor do we accept the Millers' invitation to examine parts of Mr. Shaw's deposition not presented to the trial court. *See Dioxin/Organochlorine Ctr. v. Department of Ecology*, 119 Wn.2d 761, 771, 837 P.2d 1007 (1992) (reviewing court considers only evidence admitted by trial court).

cella Clark. Like Mr. Tuttle, the Clarks landscaped and otherwise used the property up to the original fence, except that the Shaws trimmed one hedge on both sides along part of the fence. In 1986, Bruce and Pam Miller purchased the south lot from the Clarks, and Lowell Anderson and Laurie Baker purchased the north lot from the Shaws. Like Mr. Tuttle and the Clarks, the Millers used the property up to the original fence.

Anderson/Baker had the property surveyed in 1991. The survey indicated that the correct platted line for their lot lies south of the fence line by 3.5 feet on the east near the road and by 6.5 feet on the west near the lake. They told the Millers they planned to build a fence on that line.

In 1994, the Millers sued to quiet title, claiming adverse possession of the land up to the original fence based upon the exclusive use of the disputed area by them and their predecessors. Anderson/Baker denied any exclusive use, arguing that (1) the recorded 1968 boundary line agreement established the boundary, (2) any use by the Millers or their predecessors was permissive, and (3) any adverse use was not for the 10-year statutory period required for adverse possession. Anderson/Baker asked the court to quiet title in them.[2]

The trial court found that Mr. Tuttle's use was permissive, but concluded the permission granted by the Shaws to Mr. Tuttle was revoked as a matter of law when Mr. Tuttle conveyed his property. The court found that Mr. Tuttle's successors in interest, the Clarks, landscaped the property to the fence line, and that their use was exclusive, uninterrupted, open, notorious, and hostile for the statutory 10-year period. The court found that "[l]ittle evidence exists on the issue of permissive use after Tuttle conveyed . . . to the Clarks although an inference does exist that such use might have been permissive[,]" but concluded that Anderson/Baker failed to prove by a preponderance of the

---

[2]Anderson also brought a third party claim against the Shaws for breach of the 1986 statutory warranty deed. The court bifurcated the trial on the claim against the Shaws.

evidence that this use was permissive, and quieted title in the Millers.

## Adverse Possession[3]

■ The doctrine of adverse possession arose "to assure maximum utilization of the land, encourage the rejection of stale claims, and quiet titles." *Roy v. Cunningham*, 46 Wn. App. 409, 412, 731 P.2d 526 (1986) (citing *Chaplin v. Sanders*, 100 Wn.2d 853, 859-60, 676 P.2d 431 (1984) (citing 7 RICHARD R. POWELL, POWELL ON REAL PROPERTY ¶ 1012[3] (1982))), *review denied*, 108 Wn.2d 1018 (1987); *see also* William B. Stoebuck, *The Law of Adverse Possession in Washington*, 35 WASH. L. REV. 53, 53 (1960). But courts will not permit "theft" of property by adverse possession unless the owner had notice and an opportunity to assert his or her right. *See* 7 RICHARD R. POWELL & PATRICK J. ROHAN, POWELL ON REAL PROPERTY ¶ 1012[3], at 91-12 (Lori A. Hauser ed. 1991). Thus, no presumption exists in favor of the adverse holder because "possession will be presumed to be in subordination to the title of the true owner." *Muench v. Oxley*, 90 Wn.2d 637, 642, 584 P.2d 939 (1978), *overruled on other grounds in Chaplin*, 100 Wn.2d at 861 n.2.

Adverse possession requires proof of 10 years' possession that was (1) exclusive, (2) actual and uninterrupted, (3) open and notorious, and (4) hostile. RCW 4.16.020; *ITT Rayonier, Inc. v. Bell*, 112 Wn.2d 754, 757, 774 P.2d 6 (1989) (citing *Chaplin*, 100 Wn.2d at 857). The 10-year period may be shown by tacking a predecessor's adverse use if privity exists between them, and they have held continuously and adversely to the title holder. *Roy*, 46 Wn. App. at

---

[3]The parties focus their arguments on the impact of the 1968 boundary line agreement. In an attempt to explain the impact of that agreement, the parties cite cases applying other theories of resolving boundary disputes; however, none of these theories is relevant to our resolution of this case because the trial court was asked only to consider adverse possession. *See Lamm v. McTighe*, 72 Wn.2d 587, 591, 434 P.2d 565 (1967) (listing boundary theories: (1) adverse possession, (2) parol agreement between adjoining landowners, (3) estoppel in pais, (4) location by common grantor, (5) mutual recognition and acquiescence); *see also* WILLIAM B. STOEBUCK, 17 WASHINGTON PRACTICE, REAL ESTATE: PROPERTY LAW § 8.21, at 519-20 (1995).

413-14. Because the holder of legal title is presumed to possess the property, the party claiming adverse possession bears the burden of proof on each element. *ITT Rayonier*, 112 Wn.2d at 757-58.

██ ██ Adverse possession is a mixed question of law and fact: whether the necessary facts exist is for the trier of fact, but whether those facts constitute adverse possession is an issue of law for the court to decide. *Chaplin*, 100 Wn.2d at 863; *Anderson v. Hudak*, 80 Wn. App. 398, 401-02, 907 P.2d 305 (1995). "Whether use is adverse or permissive is a question of fact." *Miller v. Jarman*, 2 Wn. App. 994, 997, 471 P.2d 704 (citing *Northwest Cities Gas Co. v. Western Fuel Co.*, 13 Wn.2d 75, 84, 123 P.2d 771 (1942)), *review denied*, 78 Wn.2d 995 (1970).

## Permission

██ This case requires examination of the impact of permission on the hostility element of adverse possession. Generally, the hostility element requires proof that the possessor treated the property as an owner would. *Chaplin*, 100 Wn.2d at 860-61. But "permission to occupy the land, given by the true title owner to the claimant or his predecessors in interest, will still operate to negate the element of hostility." *Id.* at 861-62. This qualification means that "a different set of rules applies when the initial use is permissive." *Granston v. Callahan*, 52 Wn. App. 288, 293, 759 P.2d 462 (1988) (applying *Chaplin* analysis to claim of prescriptive easement). Hostility does not mean personal animosity or even adversarial intent. It connotes rather that the claimant's use has been hostile to the title owner's, in that the claimant's use has been that of an owner. *See Chaplin*, 100 Wn.2d at 857-58. Use with the true owner's permission thus cannot be use hostile to the true owner's title.

Permission can be express or implied; an inference of permissive use arises when it is reasonable to assume "that the use was permitted by sufferance and acquiescence." *Granston*, 52 Wn. App. at 294. The 1968 boundary agree-

ment between Mr. Tuttle and the Shaws does not contain an express grant of permission to Mr. Tuttle to use the disputed area. In context, however, the agreement, Mr. Shaw's testimony, and other evidence in the record establish that the Shaws gave at least implied (and perhaps express) permission to Mr. Tuttle to use the disputed area. The trial court so found, and the Millers have not cross appealed this finding.

■■ The question then is whether any subsequent act terminated permission such that a hostile use arose. Generally, the party claiming adverse possession bears the burden of proving that permission terminated either because (1) the claimant has asserted a hostile right, or (2) the servient estate has changed hands through death or alienation. *Granston*, 52 Wn. App. at 294-95; *see also Ormiston v. Boast*, 68 Wn.2d 548, 551, 413 P.2d 969 (1966) (permissive use cannot ripen into prescriptive use unless distinct change in use provides notice to owner). Because permission is personal to the grantor and cannot extend beyond that person's ownership, the relevant viewpoint for determining when permissive use terminates is that of the party granting the permission. *See Granston*, 52 Wn. App. at 295.

The Millers contend that Mr. Tuttle's 1973 sale to the Clarks terminated the permissive use because permission is merely a license that is revocable, personal, non-assignable, and terminates upon the sale of either estate. For this proposition, the Millers rely on a line of Pennsylvania cases holding that permissive use terminates upon transfer of either estate because permission, like a personal license, is not alienable. *See Waltimyer v. Smith*, 383 Pa. Super. 291, 556 A.2d 912, 914-15 (1989); *Orth v. Werkheiser*, 305 Pa. Super. 576, 451 A.2d 1026, 1029 (1982). In reaching this holding, these cases apply Pennsylvania case precedent holding that a license is a privilege personal to the licensee, and thus not assignable. *Waltimyer*, 556 A.2d at

914.[4] The *Waltimyer* court also reasoned that an owner who knows another is using his or her land bears the burden of finding out whether the other person is acting with permission and, if not, is obliged to assert his or her rights. *Waltimyer,* 556 A.2d at 915 (citing Justice O.W. Holmes, *The Path of Law,* 10 HARV. L. REV. 457, 476-77 (1897)). We decline to adopt the reasoning of these cases.

Certainly it is true that permission to use another's land is not assignable. Our cases hold, however, that when use is permissive at the outset, an adverse claim cannot lie unless the true owner has some notice that an adverse claim is being made. *Granston,* 52 Wn. App. at 294 (citing *Roediger v. Cullen,* 26 Wn.2d 690, 707, 175 P.2d 669 (1946); *Crites v. Koch,* 49 Wn. App. 171, 177, 741 P.2d 1005 (1987)); *see also Northwest Cities,* 13 Wn.2d at 84. This rule both protects the expectations of the property owner who grants permission and encourages cooperation between neighboring landowners. *See Roediger,* 26 Wn.2d at 707-12.

We do not believe that an owner who gives his neighbor permission to use his land should be required to monitor any and all transfers of his neighbor's estate to insure that his permission is not extinguished. Many kinds of transfers will give no notice to the world. For example, if the neighbor transfers title but remains in residence, even a vigilant owner of the servient estate may have no knowledge of the transfer. One who grants permission to his neighbor should not be required to question the status of his neighbor's title in order to make sure that his permission has not been terminated and a potentially adverse use created by operation of law. Such a requirement would run contrary to the threshold presumption in adverse possession analysis that possession is "in subordination to the title of the true owner." *Muench,* 90 Wn.2d at 642.

Nor should the rule be premised upon the assumption

---

[4]The *Waltimyer* court also held permissive use may arise from neighborly accommodation, but that the evidence did not show such accommodation. *Waltimyer,* 556 A.2d at 914. This statement suggests that a different analysis would apply when permission is a matter of neighborly accommodation; however, the opinion does not explain what analysis would apply in that circumstance.

that the use for which permission is granted will always occur in plain sight, or, indeed, that the permissive user will be a neighbor. A farmer may grant to anyone permission to use a distant field; so long as the use continues within the scope of the permission, must the farmer look to see who drives the tractor?

The Pennsylvania cases proceed from the principle that "[a] man may well accord a privilege upon his lands to one person, which he would refuse to all others." *Waltimyer*, 556 A.2d at 914. With this unremarkable proposition, we entirely agree. But once again, the rule should protect and encourage the person granting the permission. He is not well served by a rule that may effectively withdraw the permission without his knowledge, and cause him to lose his property. The Pennsylvania courts, in discussing successors in title, turn the usual rule on its head, as if the act of alienation of title by the neighbor were an attempt at de facto transfer of the permission itself:

> The general rule . . . that a use commenced by permission remains permissive until notice of the change in the character of the use is given, simply does not apply to successors in interest, as the license created by the original grant of permission terminates by operation of law upon alienation.

*Id.*

This reasoning seems to us to confuse several concepts, and to amount to a special rule for occasions when permission is granted to an adjoining owner. But permission to use land may be granted to complete strangers, and may not involve two estates. Permission may be granted for reasons which have nothing to do with the identity or property ownership of the permissive user. In cases involving neighbors, the permission is often indeed a "neighborly accommodation" dependent not upon the user's personal identity, but upon his status as a neighbor.

Prescriptive rights are not favored, and permission once granted is presumed to continue. We are thus dissatisfied with the reasoning in the Pennsylvania cases, and decline

to adopt a rule that sale of either estate terminates permission. We reaffirm the rule set forth in previous Washington cases: absent revocation, only the sale of the servient estate, clear notice, or obvious change in use terminates permission.

## Evidence Demonstrates Permissive Use Until 1986

Here it is established that Mr. Tuttle's use of the disputed area after the 1968 boundary line agreement was permissive.[5] There was no evidence of a change in use by Tuttle or his successors that would have notified the Shaws of an adverse claim and thus terminated permission. The Shaws' permission therefore extended to the Clarks.

■ This conclusion is further supported by the trial court's finding that an inference existed that the Clarks' use was also permissive.[6] But after making this finding, the trial court erroneously concluded that such an inference was insufficient proof of permissive use because it failed to meet a preponderance of the evidence test, which the court erroneously assigned to Anderson/Baker. When the use is initially permissive, the burden is on the party claiming adverse possession to show that the permission terminated and that the owner had notice of the adverse use. *Granston*, 52 Wn. App. at 294-95. The Millers presented no such proof here.

Use of the disputed area was permissive until the 1986 sale of the servient estate from the Shaws to Anderson/Baker. The Millers' use after 1986 was adverse, but the trial court erred by tacking the Clarks' permissive use to the Millers' adverse use. Absent this tacking, the Millers

---

[5]While the Millers' failure to appeal makes it unnecessary to address their challenge to the finding that Tuttle's use was permissive, we note that this finding is amply supported by the record and impliedly by the 1968 agreement itself.

[6]This finding is also supported by the record. Mr. Shaw told the Clarks' workers not to grade the land all the way up to the original fence because part of the area was his property, and Mr. Shaw admitted allowing the Clarks to use the property up to the original fence as long as the Shaws' ownership up to the platted line was recognized.

could not establish adverse use for the statutory period. Thus, the trial court erred by concluding that all elements of adverse possession existed and by failing to quiet title in Anderson/Baker.

Reversed and remanded.

BAKER and BECKER, JJ., concur.

Reconsideration denied October 20, 1998.

Review denied at 137 Wn.2d 1028 (1999).