# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

GARY D. CORPRON and SUSAN M.
CORPRON, a married couple,

        Respondents,

        v.

LEIGH M. KELLOGG, a single individual,
and RUTH M. PELAN, a single individual,

        Appellants.

No. 69565-7-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: April 14, 2014

APPELWICK, J. — The Corprons sued Kellogg seeking quiet title to a narrow, triangular shaped strip of land on the Corprons' property. Kellogg counterclaimed seeking quiet title based on adverse possession. The trial court concluded that Kellogg failed to prove the elements of adverse possession and quieted title to the Corprons. We affirm.

## FACTS

Respondents Gary Corpron and Susan Corpron own a five acre parcel of real property in Arlington, Washington. The Corprons have lived on the property continuously since September 11, 2003, when they purchased it from Evelyn Dorsett. Dorsett owned and occupied the property from approximately March 4, 1987 until the time of sale.

Appellants Leigh Kellogg and Ruth Pelan[1] own the five acre parcel of real property immediately west of the Corprons' property. Kellogg purchased the property on October 26, 2004 from Mark Selvig. Kellogg lived on the property from the time of

---

[1] We refer to the appellants collectively as "Kellogg." Pelan does not live on the property; she holds only an equitable mortgage, because she helped Kellogg with the down payment for the property.

purchase until 2012, when she began renting it to a third party. Selvig lived on the property from approximately 1999 to 2004. Selvig purchased the property from Michael Van Putten, who lived on the property from approximately 1995 to 2000. During that period, Lori Takaki, who is Selvig's sister and Van Putten's ex-wife, also lived on the Kellogg property.

The dispute between Kellogg and the Corprons arises from a long, narrow triangular strip of land that sits entirely on Corprons' property (the disputed area). The disputed area runs north and south near the boundary separating the two properties, angling east as it extends northward—forming the triangle shape. The area is approximately 453 feet long, a few feet wide at the southern end, and 24.9 feet wide at the northern end. It does not extend all the way to either the northern or the southern boundary of the parties' properties.

Before 1995, Dorsett built a wood post and lattice fence in the disputed area (wood/lattice fence). The fence does not run directly along the property line, but rather angles east as it extends north. Dorsett later added cedar slats to the fence and her son, Darold Anderson, extended the cedar fence southward an additional length. The wood/lattice fence is a "hanging" fence, which means it allows easy access from one side of the fence to the other and between the parties' properties. The fence runs only about one-third of the total length of the parties' boundary line.

Dorsett initially built and maintained the wood/lattice fence as a privacy barrier and screen for odor and dust between the properties. Testimony at trial indicated that the fence was not originally built or used to demarcate the property line. However, as time went on, subsequent owners viewed the wood/lattice fence as the border line

2

fence. The wood/lattice fence is still in place, though a portion has fallen down in recent years.

In May 1995, Van Putten installed a wire gauge and post fence in the disputed area (Van Putten fence). The Van Putten fence ran immediately adjacent to the western side of the wood/lattice fence, but extended an additional 122 feet north of the wood/lattice fence. Van Putten originally built and used the fence to contain horses and keep those horses off the wood/lattice fence. The Van Putten fence enclosed the disputed area and prevented passage from one side to the other.

In February 2005, the Corprons removed the portion of the Van Putten fence that extended north of the wood/lattice fence. The trial court found that the Corprons did not ask permission to remove the fence, but Kellogg would have given permission had they done so.

In 2007, Kellogg installed a wood post and electric fence in the disputed area (Kellogg fence). The fence parallels the wood/lattice fence, but extends farther north than the wood/lattice fence. The Kellogg fence remained in place at the time of trial. The Corprons also later installed fencing in the disputed area to the west of the wood/lattice fence. Kellogg removed that fencing without the Corprons' permission.

On October 8, 2010, the Corprons filed a complaint against Kellogg seeking quiet title to the disputed area and damages. The Corprons asserted that Kellogg had erected fences encroaching on their property. They requested that Kellogg be ejected and permanently enjoined from entering their property.

Kellogg answered and admitted that the Corprons were the recorded owners of the disputed area. However, Kellogg counterclaimed, alleging adverse possession of the land and seeking an order of quiet title.

At trial, the court heard oral testimony from the Corprons, Kellogg, expert surveyor Robert Huey, Van Putten, Takaki, Anderson, and Selvig.

On October 15, 2012, the trial court entered findings of fact and conclusions of law, including the following challenged finding:

> 5. Historic Use and Maintenance of Disputed Area. The testimony and exhibits admitted at trial showed neither Kellogg nor her predecessors used, maintained or kept a line fence in the Disputed Area for any consecutive ten-year period. More specifically, at trial, the evidence showed the following regarding the historic use of the Disputed Area:
>
> a. Van Putten/Takaki. From approximately May 1995 to 2000, Van Putten and Takaki kept horses on the Kellogg Real Property and in the Disputed Area. After approximately 2000, no one kept animals in the Disputed Area.
>
> From approximately 1999-2000, Van Putten mowed a small patch of grass near the Southeastern corner of the Kellogg Real Property. A portion of that grass was located in the Disputed Area.
>
> As discussed herein, in May of 1995, the Van Putten Fence was installed, but the portion extending northerly of the Wood Lattice Fence was removed February of 2005.
>
> Neither Van Putten nor Takaki otherwise regularly used or maintained the Disputed Area during Van Putten's ownership of the Kellogg Real Property.
>
> b. Selvig. From approximately 2003 to 2004, Selvig mowed the small patch of grass near the Southeastern corner of the Kellogg Real Property, a portion of which was located in the Disputed Area. Selvig also, on a single occasion in approximately 2003 or 2004, removed saplings from the Kellogg Real Property, some of which were in the Disputed Area.

4

Except as stated above, between 1999 and 2004, Selvig did not otherwise use or maintain the Disputed Area. Selvig did not: (1) keep horses or other animals; (2) add to or maintain any fencing; (3) install any improvements; and or (4) weed, in the Disputed Area. There was no continuous use of the Disputed Area from the time Van Putten and Takaki occupied the Kellogg Property to the time Selvig occupied that Property. During Selvig's ownership of the Kellogg Property, apart from the maintenance in 2003 and/or 2004 described above, the Disputed Area became and remained overgrown with weeds and brush.

c. Use by the Corprons. The Corprons testified at trial they regularly used and maintained the Disputed Area from 2003 to 2010 and that, during that period, they mowed, weeded, removed debris (including tree branches), raked and removed rocks. Kellogg's testimony at trial indicated she used the Disputed Area and did not observe the Corprons using that Area from Spring 2005 until 2010. The Court found neither Party's testimony persuasive by a preponderance of the evidence and specifically found the Corprons' position on the this [sic] issue to lack credibility.

d. Kellogg. When Kellogg purchased her Real Property in 2004, the Disputed Area was unmaintained and overgrown with weeds and brush. Kellogg did nothing to maintain the Disputed Area until approximately six months after she purchased that Property.

The trial court concluded that Kellogg failed to meet her burden of proving adverse possession, because Kellogg and her predecessors' possession of the disputed area was not "1) exclusive, 2) actual and uninterrupted, 3) open and notorious, and/or 4) hostile and under a claim of right, during any continuous 10-year period." The court concluded that the Corprons removed a portion of the Van Putten fence in February 2005, less than 10 years after its installation in May 1995. Once the Van Putten fence was removed, only a hanging fence was left, which allowed easy access from either side. Thus, the trial court concluded, Kellogg failed to show exclusive possession over a 10-year period.

The trial court further concluded that even if the Corprons had not removed the Van Putten fence, Kellogg's adverse possession claim would still fail. The court

5

reasoned that Kellogg and her predecessors "failed to use, possess or maintain the Disputed Area in the manner of a true owner over the required 10-year period." The use and maintenance of the disputed area by Van Putten, Takaki, and Selvig—keeping horses, periodically mowing a small patch of lawn, and removing saplings once—did not last for any continuous 10-year period and was insufficient to be actual, open, and notorious. Because of breaks in use and maintenance of the disputed area between Van Putten and Selvig, and then between Selvig and Kellogg, the trial court held that there was no continuous adverse possession of the land.

The trial court quieted title to the disputed area in the Corprons and ejected Kellogg from the land. It also entered a judgment awarding the Corprons $400 for the fencing that Kellogg removed. It further awarded the Corprons $200 in statutory attorney fees and $634 in statutory costs.

Kellogg appeals the trial court's findings of fact and conclusions of law, as well as the judgment.

## DISCUSSION

When the trial court enters findings of fact and conclusions of law, our review is limited to determining if the findings of fact are supported by substantial evidence and if the findings of fact support the conclusions of law. Douglas v. Visser, 173 Wn. App. 823, 829, 295 P.3d 800 (2013). Substantial evidence is evidence sufficient to persuade a fair-minded, rational person of the truth of the declared premise. Id. We view the evidence and reasonable inferences from the evidence in the light most favorable to the prevailing party. Jensen v. Lake Jane Estates, 165 Wn. App. 100, 104, 267 P.3d 435 (2011). Though the trier of fact is free to believe or disbelieve any evidence presented

at trial, appellate courts do not hear or weigh evidence, find facts, or substitute their opinions for those of the trier of fact. Id. at 104-05. Unchallenged findings are verities on appeal. Id. at 105.

Adverse possession is a mixed question of law and fact. Miller v. Anderson, 91 Wn. App. 822, 828, 964 P.2d 365 (1998). To establish ownership of a piece of property through adverse possession, the claimant's possession must be: (1) exclusive, (2) actual and uninterrupted, (3) open and notorious, and (4) hostile. ITT Rayonier, Inc. v. Bell, 112 Wn.2d 754, 757, 774 P.2d 6 (1989). Each of these necessary concurrent elements must exist for the statutorily prescribed period of 10 years. RCW 4.16.020(1). The party claiming adverse possession bears the burden of proving each element by a preponderance of the evidence to overcome the presumption of possession in favor the legal title holder. Bell, 112 Wn.2d at 757; Teel v. Stading, 155 Wn. App. 390, 394, 228 P.3d 1293 (2010).

I.   Hostile Possession

Kellogg argues that the trial court erred in considering the purpose and manner in which Kellogg and her predecessors used the disputed area. Kellogg contends that the Van Putten fence was a boundary line fence. Relying on Wood v. Nelson, 57 Wn.2d 539, 358 P.2d 312 (1961), she argues that this constitutes prima facie evidence of hostile possession, and so the actual use of the disputed area is irrelevant.

In Chaplin v. Sanders, the Washington Supreme Court held that the hostility element of adverse possession "requires only that the claimant treat the land as his own as against the world throughout the statutory period." 100 Wn.2d 853, 860-61, 676 P.2d 431 (1984). Thus, the nature of the claimant's possession "will be determined solely on

7

the basis of the manner in which he treats the property." Id. at 861. This is an objective determination based on the claimant's use of the land. Anderson v. Hudak, 80 Wn. App. 398, 402, 907 P.2d 305 (1995). The claimant's subjective belief regarding his true interest in the land and his intent to dispossess the legal title holder is irrelevant to that determination. Chaplin, 100 Wn.2d at 861.

Therefore, the manner in which Kellogg's predecessors used the disputed area is plainly relevant to Kellogg's adverse possession claim. What does not matter is their subjective intent to dispossess Dorsett or the Corprons of legal title to the disputed area. Under Chaplin, the trial court properly considered evidence of use in evaluating Kellogg's adverse possession claim.

The Wood court recognized that a fence is the usual means to exclude strangers and establish dominion and control characteristic of ownership. 57 Wn.2d at 540. There, the defendants claimed that a wire fence was used to confine animals and was never intended to mark the property line, and so it did not establish adverse possession. Id. The trial court rejected this assertion, because the fence ran parallel to the true boundary line for the entire length of the property. Id. The appellate court agreed and held that "[w]here a fence purports to be a line fence, rather than a random one, and when it is effective in excluding an abutting owner from the unused part of a tract otherwise generally in use, it constitutes prima facie evidence of hostile possession up to the fence." Id. at 541.

The Van Putten fence is distinguishable from the fence at issue in Wood. Van Putten and Takaki built and used the fence to contain their horses and keep the horses off the wood/lattice fence. Kellogg does not challenge the trial court's finding to this

effect, so it is a verity on appeal. The record is also clear that the disputed area does not extend the entire length of the boundary line, or even reach the northern or southern boundary of the properties. Nor does the disputed area run parallel to the actual boundary line—instead it angles east as it extends northward.

Therefore, this case is not on all fours with Wood. Kellogg's facts do not establish a prima facie case of hostile possession under Wood. Furthermore, even if we were to hold that the animal fence established prima facie hostile possession for Kellogg, not all of the other elements of adverse possession were established.

## II. Actual Use and Uninterrupted Possession

Kellogg argues that the trial court failed to consider evidence of use that occurred prior to construction of the Van Putten fence—specifically, Van Putten's land clearing and grading activities in the disputed area in February 1995. Relying on Frolund v. Frankland, 71 Wn.2d 812, 431 P.2d 188 (1967), overruled by Chaplin, 100 Wn.2d at 861 n.2, Kellogg contends that these grading activities "unfurled the flag" of hostile ownership and began the 10-year adverse possession period before Van Putten built the fence in May 1995.[2]

The general test of actual possession is whether the claimant's use and occupancy of the land is "'of the character that a true owner would assert in view of [the land's] nature and location.'" Chaplain, 100 Wn.2d at 863 (emphasis omitted) (quoting Krona v. Brett, 72 Wn.2d 535, 539, 433 P.2d 858 (1967), overruled by Chapin, 100

---

[2] Being overruled by Chaplin as to the claimant's subjective intent to use the land, the vitality of Frolund is in doubt and is of limited use to us. However, we note that whether grading commences adverse possession is a question of fact, not a question of law.

Wn.2d 861 n.2); 17 WILLIAM B. STOEBUCK & JOHN W. WEAVER, WASHINGTON PRACTICE: REAL ESTATE: PROPERTY LAW § 8.9, at 518 (2d ed. 2004).

Some activities that Washington courts have held to establish actual possession of rural land include: building a fence and cultivating up to it; clearing land, constructing and occupying buildings, and planting orchards; farming, pasturing, planting an orchard, and building irrigation ditches; and maintaining a partial fence and annually cutting brush. 17 Stoebuck & Weaver, supra, § 8.10, at 520-21. Conversely, the following activities have been held not to amount to actual possession of rural or semi-rural land: having an old, dilapidated fence in an unused strip overgrown with trees and brush; maintaining an irregular fence of poles and brush, taking timber, and once planting cabbages; and maintaining a fence intended to be a cattle fence and not a line fence. 17 Stoebuck & Weaver, supra, § 8.10, at 521.

The facts here are most similar to the latter group of cases. Van Putten and Takaki built and used the Van Putten fence to contain horses and keep the horses off the wood/lattice fence. They used the fence in this manner from May 1995 until they moved out in 2000. Takaki testified that neither she nor Van Putten repaired or maintained the fence after they built it.

Selvig then lived on the Kellogg property from 1999 to 2004.[3] During that time, Selvig once removed saplings from the disputed area. He also mowed a small patch of grass partially in the disputed area sometime during 2003 or 2004. Otherwise, Selvig explained, he "didn't use that space." He testified that he did not repair the Van Putten

---

[3] Selvig, Takaki, and Van Putten all lived on the property together in 1999 and 2000.

10

fence during his tenure. Nor did he keep animals, install any improvements, weed, or garden in the disputed area. Selvig recalled the disputed area being overgrown with brush and trees while he lived on the property.

When Kellogg bought the property in October 2004, she found the disputed area overgrown with tall grasses and brush—consistent with Selvig's testimony that he did not use the area. Kellogg did not use the disputed area until May or June 2005. Thus, substantial evidence in the record supports the trial court's finding of only sporadic rather than continuous use in the disputed area.

Moreover, even if grading alone is sufficient to "unfurl the flag" of adverse possession, Kellogg failed to show by a preponderance of the evidence precisely when in February 1995 Van Putten began grading activities. In his pretrial deposition, Van Putten testified that he began constructing the fence in May 1995. After he was deposed but before trial, Van Putten developed a romantic relationship with Kellogg. On direct examination at trial, Van Putten testified that he began a finish grade of the disputed area in February 1995. He further testified that he began constructing the fence around March 1995. Confronted with this conflicting testimony on cross-examination, Van Putten stated that "I think I previously said March earlier this afternoon, March, May. I'll stick with May." Van Putten admitted that it was tough to remember the exact date 17 years later, but recalled that he built the fence in "late spring, early summer."

The trial court did not make a finding about the grading activities. We presume that the lack of a finding on this issue is a negative finding against Kellogg, because she bears the burden of proof. Taplett v. Khela, 60 Wn. App. 751, 760, 807 P.2d 885

(1991). Given Van Putten's imprecise testimony, Kellogg failed to establish that Van Putten began grading activities 10 years before the Corprons removed a portion of the Van Putten fence in February 2005.[4]

All this evidence supports the trial court's conclusion of law that Kellogg and her predecessors failed to "use, possess or maintain the Disputed Area in the manner of a true owner over the required 10-year period." We hold that Kellogg's adverse possession claim fails.

We affirm.

WE CONCUR:

---

[4] Kellogg also argues that the trial court should have projected a boundary line where the original Van Putten fence still exists, because that portion of the fence has been in place for more than 10 years. This argument fails. The use and maintenance of the disputed area by Kellogg and her predecessors was not actual, uninterrupted, or hostile for 10 years, regardless of the continuing existence of a portion of the Van Putten fence. Furthermore, the record does not show that Kellogg argued this theory of lesser encroachment below, so the trial court was not in a position to fashion an intermediate remedy. There is no error.

12