# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

CITY OF REDMOND, a Washington municipal corporation,

Appellant,

v.

BRIAN and MARILYN HOWE, husband and wife,

Respondents.

)
)
)
)
)
)
)
)
)
)
)
)
)

No. 70815-5-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: February 2, 2015

SPEARMAN, C.J. — This appeal arises from a dispute over the ownership of a parking lot located adjacent to commercial property in Redmond, Washington. The Howes sought to quiet title in the lot, which is owned in record title by the City of Redmond (City). The Howes claim that they have acquired ownership of the parking lot by adverse possession or, in the alternative, that they have a prescriptive easement. At trial, the trial court entered partial summary judgment for the Howes. The parties stipulated to a ruling against the City on the remaining fact issue for trial and entered a stipulated judgment. The City appeals, arguing that the undisputed facts fail to establish the Howes' hostile possession of the disputed parcel. We affirm.

FACTS

The parties dispute ownership of a parking lot that comprises a small portion of a much larger tract of former railroad property, previously owned by Burlington Northern/Santa Fe Railroad (BNSF) and its predecessor, Northern Pacific Railroad. This larger tract was transferred by BNSF to the Port of Seattle in 2009. In June 2010, the City acquired title to approximately 3.9 miles of the tract, including the parking lot at issue here. The parking lot lies adjacent to commercial property owned by the Howes, who, along with their predecessors in interest, have used and maintained the parking lot for over two decades.

The Howes contend that they have acquired ownership of the parking lot by adverse possession or, in the alternative, claim to have a prescriptive easement. In cross motions for summary judgment below, the Howes maintained that they were entitled to judgment because the undisputed facts established each element of their adverse possession claim: possession of the parcel for ten years that was exclusive, actual and uninterrupted, open and notorious, and hostile.[1] The City argued that as a matter of law the Howes could not establish the hostility element and moved the court for judgment in its favor. The trial court denied the City's motion and granted the Howes' motion in part. The City's motion for reconsideration, was denied. The City appeals, renewing its argument that the Howes cannot establish the hostility element based on the undisputed

---

[1] Chaplin v. Sanders, 100 Wn.2d 853, 858, 860-62, 676 P.2d 431 (1984).

facts and the City is entitled to judgment. The relevant facts before the trial court and on appeal are set out below.

The Howes purchased the commercial property located at 16725 N.E. Cleveland Street in Redmond, Washington in July 1990 from Kelley Properties (Kelley). At the time of the sale, Kelley leased approximately 12,425 square feet of right of way from BNSF, which it had paved, landscaped, and used as a parking lot for its commercial tenants and their customers. Kelley paid BNSF approximately $476 per month in rent for the parking lot. The BNSF/Kelley lease was still in effect at the time the Howes purchased the Kelley property.[2]

The parties disagree whether the Howes were aware of the BNSF/Kelley lease when they purchased the Kelley property in 1990. But it is undisputed that the Howes neither paid rent to, executed a new lease with, nor sought permission from BNSF, to use the parking lot. It is also undisputed that after the Howes took possession of the Kelley property, they continued to use the parking lot for business purposes.[3]

In 1993, BNSF attempted to prohibit the Howes' access to the parking lot by placing approximately 16 large concrete ecology blocks in a line along the

---

[2] In January 1990, on the eve of sale to the Howes, Kelley's representative sought to reform the BNSF/Kelley lease, requesting a lower rental price in order to facilitate a sale of the Kelley property. The record does not indicate whether Kelley and BNSF reached an agreement on this matter.

[3] In January 2006, the Howes sold their property to Cleveland Holdings, LLC, which operated a business known as Norsk Remodeling on the premises from January 2006 to June 2010. Cleveland Holdings continued to use the parking parcel in the same manner as the Howes. In June 2010, the Howes reacquired the property via foreclosure sale. Shortly thereafter, the Howes leased the premises to Hope-Link, a local charitable organization. Hope-Link has been operating on the property since fall 2011. Hope-Link, its employees, volunteers, and customers have used the parking parcel in the same manner as the Howes during their occupancy. For purposes of this memorandum, the use and possession of these parties is referred to collectively as that of "the Howes."

southern boundary with the Howes' property, blocking the Howes' access to the parking lot. The next morning the Howes used a truck to push several of the blocks out of the way and immediately resumed use of the parking lot. In 1996, the Howes moved the remaining ecology blocks and had the parking lot resurfaced. Around 1995, the Howes resurfaced and restriped the parking lot and removed some trees. Aside from the action in 1993, neither BNSF nor its successors ever obstructed or interfered with the Howes' possession and use of the parking lot until this dispute arose.

In 1998 or 1999, a BNSF representative approached the Howes to inquire whether they were interested in purchasing the parking lot. The Howes had lunch with the BNSF representative to discuss terms of a potential sale. The parties dispute the nature of this discussion and whether it involved the property at issue in this case and whether it resulted in the Howes making an offer to purchase the property. It appears undisputed, however, that negotiations regarding BNSF's offer to sell the property occurred and that at about the time of the discussions, the Howes applied for a loan in the amount of $111,600, the amount BNSF asserts was the agreed upon purchase price.[4] There is no evidence that during the discussions the Howes expressed a claim of ownership or prescriptive rights over the parking lot or that BNSF acknowledged such a claim. Nor is it asserted

---

[4] The bank records produced by the Howes on summary judgment show that they applied for a loan in the amount of $111,600 to "acquire additional land for use as a parking lot. Land to be acquired totals approximately 12,400 square feet." Clerk's Papers (CP) at 189. "The land contiguous...is being sold by Burlington Northern/Santa Fe Railroad as part of new company policy to sell excess holdings." CP at 192. The description of the land in the loan documents is consistent with the description of the parking lot at issue in this case. The Howes claim, and BNSF does not dispute, that they did not proceed with seeking funding because BNSF could not provide sufficient proof of ownership.

4

that the Howes expressly acknowledged BNSF's ownership of the property. During and after the discussions, the Howes continued to use the parking lot as they had since 1990.

The Howes initiated this action on December 23, 2011 and in April 2012, sent a letter to the City claiming ownership of the parking lot.

## DISCUSSION

We review the trial court's entry of summary judgment de novo. Ranger Ins. Co. v. Pierce County, 164 Wn.2d 545, 552, 192 P.3d 886 (2008). Summary judgment is proper if, viewing the facts and inferences in favor of the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Id.; CR 56(c).

A party claiming title to land by adverse possession bears the burden of establishing actual possession of the parcel for ten years that was (1) exclusive; (2) continuous and uninterrupted; (3) open and notorious; and (4) hostile. See Chaplin v. Sanders, 100 Wn.2d 853, 858, 860-62, 676 P.2d 431 (1984). Because the holder of legal title is presumed to possess the property, the party claiming adverse possession bears the burden of proof on each element. Id.; see also Miller v. Anderson, 91 Wn. App. 822, 828, 964 P.2d 365 (1998). In this case, the parties only dispute the element of hostility. We consider first whether the Howes' initial entry onto the parking lot was hostile or permissive.

Possession is not hostile, and so not adverse, if it is with the owner's permission. Chaplin, 100 Wn.2d at 861-62. A leasehold tenant holds a subordinate title to the lessor and necessarily possesses land with permission

from the landowner; thus, a lessee is not an adverse possessor of leased property. See Bowden-Gazzam Co. v. Kent, 22 Wn.2d 41, 154 P.2d 292 (1944); Northern Pac. Ry. Co. v. George, 51 Wash. 303, 98 P. 1126 (1908).

Permission is personal to the grantor and cannot extend beyond that person's ownership. Miller, 91 Wn. App. at 829. The party granting permission determines when permissive use terminates for purposes of adverse possession. Id. Consequently, once an adverse possession claimant has been granted permission to use or occupy another's land, conveyance of the claimant's property will not revoke that permission. Id. at 831-32. Permission to use or occupy land given to a claimant's predecessor in interest is imputed to the claimant. Id.; Chaplin, 100 Wn.2d at 862.

In this case, the trial court concluded that the Howes' initial entry was hostile because they never entered a lease with BNSF and did not pay rent. But there is no dispute that the Howes' predecessor in interest, Kelley, possessed the parking lot pursuant to a lease with BNSF. Although Kelley utilized the parking lot infrequently during its final years of possession (due to a fire and subsequent decreased tenancy in its commercial building), there was no evidence that the BNSF/Kelley lease was ever terminated, or that Kelley's permission to use the parking lot was otherwise revoked by BNSF. On the contrary, a letter sent from Kelley's representative to BNSF on the eve of sale to the Howes, which expressed Kelley's desire to renegotiate its lease terms, indicates that the BNSF/Kelley lease was still in effect. And Kelley's conveyance of its property to the Howes did not revoke BNSF's permission to use the parking

6

lot. Miller, 91 Wn. App. at 829. It is immaterial whether the Howes assumed the BNSF/Kelley lease, entered a new lease, paid rent to BNSF, or affirmatively requested permission from BNSF to use the parking lot. Because their predecessors in interest had permission to possess the parking lot, the Howes' initial possession of the parking lot was also permissive.

Occupation that is permissive in its inception cannot ripen into adverse possession, but only if there has been a "distinct and positive assertion by the dominant owner of a right hostile to the owner. . . ." Northwest Cities Gas Co. v. Western Fuel Co., 13 Wn.2d 75, 84, 123 P.2d 771 (1942). However, "courts will not permit the 'theft' of property by adverse possession unless the owner had notice and an opportunity to assert his or her right." Herrin v. O'Hern, 168 Wn. App. 305, 310, 275 P.3d 1231 (2012) Thus, where a claimant's use of land is less than pervasive, courts are reluctant to acknowledge that the use is hostile to the owner. In this case, it is undisputed that the Howes and their predecessors were the sole occupiers and users of the property for more than twenty years. And most significantly, in 1993, the Howes rebuffed BNSF's only attempt to exclude them from the parking lot by removing the barricade BNSF had placed there. This was a distinct and positive assertion of a right hostile to the owner that put BNSF on notice of the hostile nature of the Howes' claim. The trial court properly concluded that this act triggered the adverse possession period.

Next, we consider whether the Howes' hostile possession terminated prior to the running of the ten-year adverse possession period. It is well established that a claimant who recognizes superior title in the true owner during the

7

statutory period cannot establish the element of hostility, so long as that recognition is established by the claimant's objective conduct. Chaplin, 100 Wn.2d 853. The City argues that the Howes' offer to purchase the property from BNSF constituted such objective conduct and defeated their claim of hostility.[5] We disagree.

In general, an adverse possession claimant's offer to purchase disputed land does not defeat the hostile nature of the claimant's occupation. As explained in American Law Reports:

> the rule seems well settled that such purchase will not in and of itself interrupt the adverse possession. This is true for the evident and practical reason that one claiming adversely may, and usually does, desire, in making the purchase, merely to protect his possession and to avoid possible litigation, and he should not be deemed to have intended to abandon a title by conduct the purpose of which was to strengthen it. As has been said: "He joins the two together, and possesses whatever title both may give him." See Omaha & F. Land & T. Co. v. Hansen (1891) 32 Neb 449, 49 NW 456, infra.
>
> The purchase "does not prove, and alone it does not even tend to prove, a change in the character of the possession or a recognition of a title paramount." Oldig v. Fisk (1897) 53 Neb 156, 73 NW 661, infra.

125 A.L.R. 825 (Originally published in 1940).

Washington cases addressing the issue are consistent with this position.

In El Cerrito, Inc. v. Ryndak, 60 Wn.2d 847, 854, 376 P.2d 528 (1962), a property

---

[5] Although BNSF asserts that the Howes made an offer to purchase the property, they offer no evidence in support of this claim. At most, the evidence shows that the Howes met with a BNSF representative to discuss BNSF's offer to sell the property and "[t]he negotiations proceeded to the point that the Howes applied to their bank for a loan to finance the purchase of the parking parcel from [BNSF]." Brief of Appellant at 6. The Howes deny they made such an offer. They assert that the BNSF representative offered to sell the property for a specific price and that they applied for a loan in that amount. But even if we assume, for purposes of summary judgment, that the Howes offered to purchase the property, it does not affect our analysis.

owner's eaves overhung the property line with a neighboring parcel by several feet. During negotiations to sell the property, the owner commissioned a survey and discovered the encroachment. In an effort to perfect title and expedite the sale of his parcel, the property owner made an offer to purchase the disputed strip of land, even though he believed he owned it. The trial court held that this offer was insufficient to defeat the element of hostility and the Supreme Court affirmed.

In State v. Stockdale, 34 Wn.2d 857, 210 P.2d 686 (1949), overruled on other grounds, Chaplin, the State of Washington occupied and developed approximately ten acres of land under the erroneous belief that it held title. Three years into its occupation, and after significant development, the State opened the land to the public as a state park. About two years after the park opened, a State employee discovered that many of the State's improvements encroached on the neighboring owner's property. No action was taken by the state with regard to ownership of the land at that time. Rather, the State continued to develop and use the land as a state park, open to the public. Two years later, the neighboring tract was acquired by John Rumsey, at which time "[t]here were some negotiations had between Mr. Rumsey and [the State] with reference to making some adjustment of title." Id. at 860. Apparently, these negotiations did not result in an agreement, as the State continued to use the land as a state park and brought a condemnation suit to quiet title. In response to the State's action, the plaintiff argued that the negotiations to purchase the disputed land constituted an acknowledgment of superior title by the State, which defeated its claim of hostile

9

possession. The Court disagreed, concluding that "[t]he negotiations had with a view of perfection of title rather than indulging in litigation did not operate as an interruption of the adverse possession." Id. at 862.

Similarly, in Silverstone v. Hanley, 55 Wash. 458, 460, 104 P. 767 (1909), the Court held that payment of back taxes did not necessarily defeat the element of hostility. In that case, the claimant and his predecessor in interest had exclusively possessed a parcel of land for over ten years. Id. at 458-59. The predecessor had fenced that land and planted an orchard upon it before conveying it to the claimant. Id. at 458. Years into the occupation, the claimant received a tax certificate that had been assessed to an unknown owner. Id. The Court held that the claimant's payment of the tax debt was merely a recognition of the taxing power of the state, not an acknowledgment of superior title in the "unknown owner." Id. at 459. Citing various foreign cases, the Court noted "'a party in possession of premises claiming to own the same may buy his peace by purchasing any outstanding title or claim of title without admitting such title or claim of title to be valid ... He has a right to quiet his possession and protect himself from litigation in any lawful mode that appears to him most advantageous or desirable.'" Id. (quoting Cannon v. Stockmon, 36 Cal. 535, 538-39, 95 Am. Dec. 205 (1869)).

The City relies on Peeples v. Port of Bellingham, 93 Wn.2d 766, 613 P.2d 1128 (1980)[6] to argue that an offer to purchase land is objective conduct

---

[6] To the extent the holding of Peeples relied on the Port's failure to establish its claim to the property was in "good faith," (see Peeples, 93 Wn.2d at 775) we note that that rationale was explicitly rejected in Chaplin, 100 Wn.2d at 861, n.2.

10

acknowledging superior title in another which defeats the hostility element of an adverse possession claim. But they misconstrue the holding of that case. Peeples involved an adverse possession claim asserted by the Port of Bellingham (Port) over certain coastal property. Beginning in 1957, the Port had purchased certain tidelands adjacent to the disputed parcel and began to develop them. With respect to the disputed parcel, the evidence showed that the Port obtained the permission of the owner to dredge an 80-foot channel through the property to float in rock barges. Id. at 767-69. It was undisputed that this was a "'one-time'" use with no further intended use of this channel, although it was occasionally used by fisherman as a winter moorage for their boats. Id. at 769. It was also undisputed that, between 1957 and 1970, "'[t]here were many, many years when there was nothing there.'" Id. at 770.

Later, in 1966 the Port learned that it did not own the disputed property. Id. Nevertheless, it began construction of a boat launch and related facilities. In 1972, the Port's attorney wrote a letter to the owners of the disputed parcel, offering to purchase the property. Id. In the letter, the Port specifically referred to the disputed property as "property that is *owned by Yelton and Miller* [the true owners]," expressed a "*desire[ ] to acquire this property*" and asked the true owners to "*establish your asking price* and then submit it to the Port."[7] Id. at 774-75. The parties could not agree on the terms of a sale and each sued to quiet title. Id. The trial court found for the Port and the Court of Appeals affirmed. The Supreme Court reversed.

---

[7] The subject line of the letter also refers to the property as "Yelton-Miller Property."

The Supreme Court disagreed that the evidence supported a conclusion that the Port's possession of the disputed property was uninterrupted and that its use had been open, notorious, hostile, and exclusive and held under color of title for more than ten years. Id. at 773. The Court noted that the evidence showed that the Port at no time had exclusive possession of the property and that its use of the property was not continuous. Id. Moreover, the Court found that use of the property to moor floating structures from time to time was inadequate to provide notice to an owner that someone was claiming title adversely. Id. As to the element of hostility, the Court observed that the Port dredged the property with the permission of the owners and that in the Port's letter initiating negotiations to purchase the property "it *admitted* ownership in petitioners or their predecessors in interest." Id. at 775. Nor did it assert or even imply a claim to the property. Id.

In this case it is beyond dispute that at least since 1993 when the Howes repelled BNSF's effort to exclude them from the property, the Howes have been in continuous and exclusive possession of the property. And although, the Howes responded to BNSF's offer to sell the property, there is no evidence that they expressly admitted ownership in BNSF. Indeed, during and following the unsuccessful negotiations, BNSF concedes that the Howes continued their exclusive use and possession of the property. Brief of Appellant at 6. Unlike in Peeples, where the claimant by its own admission acknowledged title in the true owner, here, the Howes at most only made an offer to purchase the property. Standing alone, this is insufficient to constitute the kind of objective conduct necessary to acknowledge superior title in another. The mere making of such an

12

offer, without more, does not negate evidence that otherwise establishes the element of hostility in an adverse possession claim. Accord El Cerrito, 60 Wn.2d at 854; Stockdale; 34 Wn.2d at 862; Silverstone 55 Wash at 460. The trial court did not err in granting partial summary judgment to the Howes on the issue of hostility.

Affirm.

WE CONCUR:

Spelman, C.J.

Trickey, J.

Appelwick, J.