# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| MICHAEL S. POKORNY and JOETTA POKORNY, husband and wife and the marital community composed thereof,<br><br>Appellants,<br><br>v.<br><br>SHOWELL OSBORN and NANCY OSBORN, husband and wife and the marital community composed thereof,<br><br>Respondents.<br><br><br>JOHN DOE and JANE DOE 1-5, NATHANIEL D. JUDD and BETHANIE R. JUDD, husband and wife and the marital community composed thereof, d/b/a JUDD TREE SERVICE, a Washington contractor, JUDDTTS875N2 and WESCO INSURANCE COMPANY under bond No. 46-WB033713,<br><br>Defendants Below. | No. 52949-1-II<br><br><br><br>UNPUBLISHED OPINION |

CRUSER, J. — Michael and JoEtta Pokorny appeal from the trial court's order granting Nancy and Showell Osborn's motion for summary judgment on adverse possession, the order quieting title, the order on the Pokornys' motion for reconsideration, the order dismissing the Pokornys' claims, and the order awarding attorney fees and costs to the Osborns. The Pokornys

argue that (1) the trial court did not have subject matter jurisdiction to address the Osborns' adverse possession claim, (2) genuine issues of material fact exist on the adverse possession claim, precluding summary judgment, (3) the trial court erred in determining the appropriate boundary line between the two properties following its ruling on the adverse possession claim, (4) the trial court abused its discretion in denying their motion for reconsideration, (5) the trial court erred in dismissing their claims upon granting the Osborns' motion for summary judgment, and (6) the trial court erred in awarding the Osborns attorney fees.

We hold that (1) the court had subject matter jurisdiction to address the Osborns' adverse possession claim, (2) there are no genuine issues of material fact on the Osborns' adverse possession claim and the Osborns were entitled to judgment as a matter of law, (3) the trial court properly drew the boundary between the two properties in accordance with its ruling on the Osborns' adverse possession claim, (4) the trial court did not abuse its discretion in denying the Pokornys' motion for reconsideration, (5) the trial court did not err in dismissing the Pokornys' claims, and (6) the trial court did not err in awarding the Osborns attorney fees.

Accordingly, we affirm.

## FACTS

### I. BACKGROUND

In 2011, Appellants Michael and JoEtta Pokorny purchased a vacation residence located in Ocean Shores, Washington, (Lot 55) at a foreclosure auction. Respondents Nancy and Showell Osborn own Lot 54, which is adjacent to and west of Lot 55.

The two properties share a common boundary that runs in a straight line north to south. Trees, shrubs, native bushes, and other vegetation run along a portion of this boundary line. In

addition to the trees, salal,[1] and other vegetation, two fences — one "[o]ld" and "dilapidated" ("old fence"), and one built more recently ("new fence") — extended from the back end of the properties toward the street. Clerk's Papers (CP) at 164. The old fence stretched approximately halfway down the boundary line between Lots 55 and 54. This fence did not enclose the rear portion of Lot 54, but instead appeared to be a "barrier" between the two properties. *Id.* The new fence was secured to the old fence boards along the same north to south line. Unlike the old fence, the new fence fully enclosed the back portion of Lot 54.

On July 6, 2015, Mr. Pokorny heard someone speaking outside his property and upon investigating, discovered that Dan Bonnell of Bonnell Tree Technicians was speaking on a cell phone with Mrs. Osborn regarding the trees and bushes along the boundary line. Bonnell gave Mr. Pokorny the cell phone so that Mr. Pokorny could discuss the issue with Mrs. Osborn, and Mrs. Osborn explained that she was considering cutting some of the trees and bushes. Mr. Pokorny stated that he and his wife like the "'privacy barrier,'" and that they do not want it cut. *Id.* at 498. Mr. Pokorny and Mrs. Osborn came to an apparent agreement that the Osborns would trim the trees on the boundary line to the eight-foot mark but would not engage in more extensive removal of the vegetation. The Osborns did not retain Bonnell's services for the project but instead hired Judd Tree Service to complete the job.

Prior to this conversation, the Osborns and the Pokornys believed the boundary line between the two lots ran down the length of the old fence, through the vegetation, and toward the street. After the conversation with Mrs. Osborn, however, the Pokornys decided they should have

---

[1] Salal is a type of leathery-leaved evergreen shrub in the heather family, native to North America. It grows up to three to four feet tall. CP at 986.

the precise location of the boundary line surveyed, and they hired a surveyor, Donald Hurd, PLS, to uncover the corner monuments that demarcate the property lines. The Pokornys did not inform the Osborns that they had hired a surveyor. Hurd uncovered the Ocean Shores corner monument that marked the front boundary between the two properties and placed orange flagged rebar next to the monument. Hurd was scheduled to return on a different day to complete marking and staking the remaining corners of the Pokorny property.

However, before the survey was completed, on August 1, 2015, the Osborns clear cut, rather than trimmed, the trees and salal that they believed were on their side of the property line. At the time of the cutting, the Osborns were not aware that the Pokornys had engaged a professional surveyor to determine the precise location of the boundary line between the lots or that the front corner monument had been unearthed.

The completed survey revealed that Lot 55, the Pokorny lot, extended several feet west onto Lot 54, past the old and new fence, and past the trees, salal, and other vegetation that the Osborns had cut. The Pokornys filed suit seeking to quiet title to the disputed strip.

The Osborns hired a separate company to survey the boundary between the lots and this second survey, completed by Berglund, Schmidt & Assoc., Inc., depicted the same boundary line as the Hurd survey. Both surveys, thus, indicated that the Pokornys' lot was larger, and the Osbornes' lot was smaller, than what the parties previously believed.

The photograph below depicts the disputed strip, flanked on either side by the line claimed as the "[a]dverse [p]ossession [l]ine" and the surveyed boundary line:



*Id.* at 594.

## II. PRIOR OWNERSHIP AND USE OF LOT 54

The Osborns purchased Lot 54 on July 11, 2007 from Justin Millard. Millard purchased the property from Richard Walter on November 21, 2006. Walter purchased the home in 1990.

### A. WALTER'S USE OF LOT 54 FROM 1990 TO 2006

Walter resided in the house on Lot 54 as a primary residence with his wife and children for 16 years. He and his family eventually moved to Colville, Washington in 2006, though he could not recall the precise date that they moved out of their home in Ocean Shores. The listing agreement for the property states that the home was vacant on April 21, 2006.

When Walter initially purchased the house, he attempted to locate the boundaries of his lot. He found a galvanized pipe on the back corner on the boundary line between Lot 54 and Lot 55, and he assumed this galvanized pipe was the back corner marker. Walter was unable to find a similar galvanized pipe marking the front end of the boundary line, but he did locate a utility pedestal that he assumed was the front corner marker. Walter stretched a string from the galvanized pipe to the utility pedestal, and he believed that this line represented the boundary between his property and Lot 55. Walter's assumption was also based on his understanding that the prior owners had established the boundary between Lots 54 and 55 in the same location because they had cleared a pathway that followed this line.

During his deposition related to this lawsuit, Walter was shown a color version of the above photograph, and he testified that the yellow line, which is labeled "[a]dverse [p]ossession [l]ine" in the photograph above in Part I, *supra*, at 5, was consistent with what he believed was the boundary line the entire time he lived at the property.

During the entire 16 years that Walter lived on Lot 54, he mowed the lawn up to the perceived boundary line (the so-called adverse possession line) "at least once a week." *Id.* at 887. Almost immediately after moving in, Walter pruned the trees and salal along this perceived boundary line "at least once a month" for maintenance, and he pruned larger branches using a chainsaw once a year. *Id.* at 889. Walter's children regularly played in the area of the yard along the perceived boundary line. And Walter constructed a green house in "very close proximity" to the rear corner galvanized pipe. *Id.* at 887.

Sometime after Walter initially purchased the home, he stacked driftwood to create a wildlife barrier along the perceived boundary line and to create a marker for this boundary. To

construct the barrier, Walter dug postholes along the line and inserted logs into those holes. As Walter collected more driftwood over several seasons, the fence grew longer, but he never fully enclosed the property, and the fence never extended all the way out to the street. In all, the fence along the perceived boundary between Lots 54 and 55 consisted of less than 20 pieces of driftwood and extended approximately 15 feet from the back of the property toward the street.

While creating a concrete porch in 1996, Walter used the excess concrete from that job to pour a concrete pad on the eastern side of the house that extended into the now-disputed strip. Walter used the concrete pad as a washing area for his vehicles. He did not use the pad as a designated parking area. Walter also used the area between his house on Lot 54 and the perceived boundary line to access his backyard with his work vehicles because he kept materials related to his landscaping business in the back of his property. Sometime before Walter installed the concrete pad, and due to rain in the winter months, Walter placed two lines of rocks near the concrete pad to enable his vehicles to reach the back of the property without getting stuck. The rocks tend to "sink into the sand immediately," and "don't last very long." *Id.* at 888. But the rocks are still in place and visible in photographs from 2016. Walter accessed his back yard using this area "daily." *Id.* at 896. Walter did not obtain a permit to build a driveway in that area, nor did he intend specifically to create a driveway along that side of his house.

For several years, Walter also owned the lot to the west of his home (Lot 53), which he used to store most of his landscaping materials.[2] Although a majority of Walter's materials were stored on the lot to the west for several years, Walter used the area along the eastern boundary line between Lots 54 and 55 to store additional landscaping materials "[c]ontinuously." *Id.* at 888.

For most of the time that Walter owned Lot 54, Lot 55 was a vacant property. Walter did not see any fences on Lot 55 while the property was vacant. Between 2003 and 2005, Jim Moors and his business partner Bill Green built a house on Lot 55.

Sometime after the house on Lot 55 was built, according to Walter's recollection, the owners of Lot 55 constructed a cedar slat fence that extended approximately 20 feet from the galvanized pipe toward the street.[3] Walter took down his driftwood barrier when the owners of Lot

---

[2] The Pokornys assert that Walter owned the lot to the west of his home and used that lot to park his vehicles and store his business supplies "during most of the years he lived at Lot 54." Br. of Appellants at 8. The Pokornys' assertion appears to be mistaken because Walter stated that he bought Lot 53 sometime in 2004 or 2005, and that he owned the property for "a short time." CP at 887. There is no evidence in the record supporting the Pokornys' assertion, even construing all reasonable inferences in the light most favorable to the Pokornys.

[3] Walter submitted two declarations in this case, one for the Pokornys and one for the Osborns. In the declaration for the Pokornys, Walter stated that on the date he sold his property in 2006, "there was no fence in the back yard of my home or along the boundary between my lot and the lot now owned by the Pokorny family." CP at 250. But in Walter's second declaration completed for the Obsorns, Walter stated that he "did not have a memory of this fence when [he] was presented with the declaration the Pokornys asked [him] to sign" but that he now believes the fence was there when he sold his home to Millard. *Id.* at 514. During his deposition, Walter admitted that when he was given the first declaration he did not "do a thorough check of [his] memory," but that as the lawsuit progressed and he was given the second declaration he "remembered new facts that [he] hadn't remembered at the time of the first declaration." *Id.* at 904-05. Walter maintained that he was "absolutely sure" there was a cedar slat fence when he sold the house, and that the fence was placed along what he perceived as the boundary between Lots 54 and 55. *Id.* at 891. In any event, photographs of the disputed area confirm the existence of two fences along the line labeled adverse possession. Moreover, the parties do not disagree that at some point, there was a partial cedar slat fence along the adverse possession line.

55 put up the cedar slat fence. Although Walter did not specifically discuss the boundary line between the two properties with either owner of Lot 55, he pointed out the galvanized pipe marker to one of the owners. The owner had been aware of the marker's location. Walter also saw one of the owners extend a line from the galvanized pipe to designate where the cedar slat fence would be built. Walter continued to regularly prune his side of the vegetation on the perceived boundary line as he had when he initially purchased Lot 54, and the owners of Lot 55 pruned the other side.

## B. MILLARD'S USE OF LOT 54 FROM NOVEMBER 21, 2006 TO JULY OF 2007

Millard purchased Lot 54 from Walter through a broker in November of 2006. When Millard bought the property, he saw "an old cedar fence," that was in "rough shape." *Id.* at 914. He believed that the boundary between Lot 54 and Lot 55 ran the length of this fence and extended through a strip of bushes and trees in a straight line toward the street. During his deposition, Millard was shown the same photograph as Walter from Part I, *supra*, at 5, which depicted two lines of rope on either side of the disputed area. Millard, like Walter, identified the yellow line that ran from the old fence, through the middle of the strip of vegetation, toward the street as what he had believed represented the eastern boundary between his lot and Lot 55.

Millard and his wife used the concrete pad originally poured by Walter to park vehicles on the eastern side of the house "[e]very now and then," when they had guests visiting. *Id.* at 915. Millard stored construction materials that he used in his work as a contractor in the back yard of Lot 54. To reach the materials in the back, Millard drove vehicles across the concrete pad that was originally poured by Walter "[a]ll the time," meaning "[a] couple times a week." *Id.*

Shortly before Millard sold the property to the Osborns, Millard built a new fence that completely enclosed the back yard. The Obsorns asked that Millard construct the fence as a request

of closing. Millard fixed the new fence posts to the old fence posts and relied on the location of the old fence to determine where the new fence should be placed.

C. THE OSBORNS' USE OF LOT 54 FROM JULY OF 2007 THROUGH PRESENT

The Osborns purchased their home in July of 2007 through a broker. When they purchased the home, they had no concern regarding precisely where the boundary line between Lot 54 and Lot 55 was located. At that time, the old fence was still in place and extended approximately halfway between the back end of their property toward the street in front. The Osborns believed that the old fence line represented the eastern boundary of their property.

Since purchasing their home, the Osborns maintained the grassy area up to the old fence line by mowing the grass and pruning and cutting the trees and salal. The Osborns completed this landscape maintenance work on their own, or they occasionally hired professional yard services to complete the projects. The Osborns also "regularly" parked their cars in the disputed strip and used the same area to access the backyard. *Id.* at 340.

### III. PRIOR OWNERSHIP AND USE OF LOT 55

Lot 55 was vacant until James Moors and Bill Green partnered to build a house on the property. Prior to that time, the vacant lot was mainly covered by brush with "perhaps a stunted Spruce or two." *Id.* at 255. Moors sold the home to Anthony and Karen Woodbeck on September 19, 2005. The Pokornys later purchased the home during a foreclosure auction on April 20, 2011.

A. MOORS'S USE OF LOT 55 FROM 2003 TO 2005

Moors and Green formed a joint venture to construct a house on Lot 55 in February of 2003 when they applied for a clearing and building permit for the lot. Moors went out to inspect the property sometime in 2003, shortly after he first became involved in the project. At that time, an

"old rickety" partial fence was visible through the trees. *Id.* at 958. This fence was on the western side of Lot 55, the side bordering Lot 54, and it ran north to south.

When shown a photograph of the old fence during his deposition, Moors confirmed that this was the fence he saw in 2003.[4] *Id.* at 959. Moors assumed that the property line was somewhere close to this fence. When shown the photograph copied above in Part I, *supra*, at 5, at a deposition, Moors testified that the yellow rope "shows where the—the property line looks like it should be, and it lines up with the fence." *Id.* at 959-60.

Moors recalled seeing Walter's pickup truck parked in the back yard on occasion, though he could not recall specifically seeing Walter drive a truck into his back yard. Moors also recalled seeing "tracks in the side of the house that was like a driveway." *Id.* at 960.

B. THE WOODBECKS' USE OF LOT 55 FROM 2005 TO 2010

The Woodbecks purchased Lot 55 in 2005 to use as a rental property. Karen Woodbeck was a project manager for construction companies and she holds a general contractor's license in Washington State.

When Woodbeck first visited the property with her real estate agent sometime in the summer of 2005, she recalled seeing a fence in "very poor" condition on the western boundary

---

[4] Moors stated in an earlier declaration that "[t]o the best of [his] recollection," he could not remember a fence on either Lot 55 or 54 when he sold Lot 55 to the Woodbecks. CP at 257. When asked about his declaration at a later deposition, Moors explained that since he completed the declaration, he had done "[a] lot of thinking," and after "going over and over it" in his memory, he recalled that there was an old fence along the western boundary of Lot 55. *Id.* at 962. Regardless, multiple photographs confirm the existence of two adjacent fences, and the parties do not disagree about the existence of these fences.

that ran from the back of the property towards the street. *Id.* at 950. Between the street and the end of the fence was a "bunch of natural vegetation and bushes." *Id.* at 934.

Upon being asked to identify what she had then believed was the boundary line between the two properties in the photograph copied in Part I, *supra*, at 5, Woodbeck identified the yellow line that ran from the old fence toward the utility pedestal labeled adverse possession line. Woodbeck never entered the disputed area while she owned the property. She believed that if she had hypothetically wanted to cut the vegetation west of the alleged adverse possession line, she would have had to obtain permission from the owner of Lot 54.

When the Woodbecks purchased the house, Woodbeck asked Green to construct a garage with a small studio in the back. Woodbeck understood, in her experience as a general contractor, that an accessory structure like the garage and studio must be set back five feet from the property line and that nothing can be built within that space.

Green set stakes to mark where the foundation for the garage would be poured, and he set additional stakes along the perceived boundary line between Lots 54 and 55. To ensure that there was a sufficient setback, Woodbeck measured the distance between the stake that Green set along the perceived boundary line and the planned location of the garage.

C. POKORNYS' USE OF LOT 55 FROM 2011 THROUGH PRESENT

Mr. Pokorny first visited the property on Lot 55 approximately three weeks before he and his wife purchased the home at a foreclosure auction in April of 2011. Mr. Pokorny intended to do a brief inspection of the property to see what kind of shape it was in prior to bidding on it, and he noticed the wooden fence that sat on the line between Lots 54 and 55 was "[w]eathered" and "aged." *Id.* at 967.

Immediately after they purchased the property, the Pokornys began to clean trash that was left by the individuals who had previously rented the home from the Woodbecks. The Pokornys cleaned cans, bottles, broken toys, dead branches, and a tire from the salal and trees between Lots 54 and 55. Mr. Pokorny walked around to the Osborn side of the hedge while cleaning to get at debris in the vegetation. This cleaning project took perhaps one or two weekends to complete.

After the initial cleaning project, the Pokornys regularly maintained the salal and other shrubbery that would creep into their driveway, but they never cut into the salal or trees in the barrier between Lots 54 and 55. On occasion, and often following a windstorm, the Pokornys would pick up branches that fell from their oversized evergreen onto the Osborn side of the trees and salal, but they did not trim or cut any of the bushes and shrubs from the Osborn side.

During Mr. Pokorny's first visit to the property, before the Pokornys purchased the home at the auction, he assumed the property line between Lots 54 and 55 was located somewhere in the tree barrier and followed the line of the old fence. In the three or four months after the Pokornys purchased the property, they attempted to find the corner markers by using a metal detector in front of the vegetation on their lot and the Osborn lot and in the back corner where the old and new fence were connected. The Pokornys did so because they thought that it would be prudent to know the precise boundary of their property. The metal detector did not reveal any corner markers. On a separate occasion, the Pokornys had a plat map showing the lots in the cul-de-sac, as well as ball of twine and a 100-foot tape measure. They intended to use the plat map to determine the distance between the relative locations of the corner markers. The Pokornys were, again, unsuccessful in determining precisely where the boundary lines of their property were located at that time. The

Pokornys did not discover the true boundary line between their lot and the Osborn lot until they retained Hurd to conduct a professional survey following the cutting.

The Pokornys used their vacation property approximately one or two weekends a month, depending on their schedules. In 2013 and 2014, they used the property less frequently, sometimes staying for only one weekend per month, or going a month without any visits. The Pokornys never stayed at the house for an entire week.

During some of the Pokornys' visits, the Osborns were also spending time at their own vacation home. On occasions when the two couples' visits to Ocean Shores overlapped, the Pokornys never saw the Osborns engage in yard maintenance, use the space in between their house and the old fence and vegetation, or park cars in that area. Mr. Pokorny did not recall seeing the Osborns use that same space for storage.

IV. PROCEDURAL HISTORY

The Pokornys filed suit on February 25, 2016, seeking an order of ejectment, a declaratory judgment confirming their fee simple ownership, and to quiet title to the disputed strip. In addition, the Pokornys' suit alleged trespass, timber trespass, and sought damages. In answering the Pokornys' complaint, the Osborns filed counterclaims seeking a declaratory judgment and to quiet title to the disputed strip in themselves, alleging that they owned the strip through adverse possession, mutual recognition and acquiescence, or estoppel in pais.

The Pokornys were the first to move for partial summary judgment on November 9, 2016, arguing that the trial court should dismiss the Osborns' mutual acquiescence and recognition and adverse possession counterclaims. The Osborns filed a cross motion for summary judgment

arguing that they have acquired title to the disputed property through adverse possession. The superior court denied both motions.

The Osborns filed a motion for partial summary judgment for a second time on March 9, 2017, arguing that since their last motion, they obtained declarations from prior owners of the properties that eliminated any remaining questions of fact on their adverse possession claim. The trial court denied this motion.

On May 14, 2018, the Pokornys again filed a motion for partial summary judgment, seeking an order of ejectment and to quiet title to the disputed strip, arguing that the trial court should dismiss the Osborns' counterclaims on adverse possession, mutual recognition and acquiescence, estoppel in pais, and declaratory judgment. The Osborns responded by renewing their motion for partial summary judgment on their adverse possession claim on June 5, 2018.

The trial court held a hearing on the motions on July 16, 2018. On September 18, 2018, the trial court granted the Osborns' motion for partial summary judgment and denied the Pokornys' motion for partial summary judgment. The trial court explained that "[i]t is undisputed" that by at least September of 2005, "when Woodbeck purchased Lot 55, there was a boundary fence in the back yard." *Id.* at 1171. The trial court also explained that the concrete slab and rocks that Walter placed in the ground are evidence of regular use of the disputed strip, and that such use satisfied the elements of adverse possession "long before [September] 2005." *Id.* Lastly, the trial court ruled that the Osborns were entitled to tack their use of the property onto their predecessors in interest.

The Pokornys filed a motion for reconsideration, which the trial court denied. The Osborns moved to dismiss the Pokornys' claims in light of the trial court's ruling on their motion for partial summary judgment. The trial court granted the Osborns' motion. The trial court also ordered the

15

Pokornys to pay the Osborns' attorney fees. Lastly, the trial court quieted title to the disputed area in the Osborns' favor, free and clear of any claim to the same by the Pokornys, and it amended the legal description of their respective lots accordingly.

The Pokornys appeal the order quieting title, the order granting attorney fees and costs, the order dismissing their claims, the order on their motion for reconsideration, and the order granting the Osborns' motion for partial summary judgment on adverse possession.

DISCUSSION

I. SUMMARY JUDGMENT STANDARD

We review a trial court's decision to grant summary judgment de novo. *Lakey v. Puget Sound Energy, Inc.*, 176 Wn.2d 909, 922, 296 P.3d 860 (2013). We conduct the same inquiry as the trial court and will affirm an order of summary judgment if there are "no genuine issue[s] of material fact and the moving party is entitled to judgment as a matter of law." *Lakey*, 176 Wn.2d at 922; CR 56(c). "'A genuine issue of material fact exists when reasonable minds could differ on the facts controlling the outcome of the litigation.'" *Ehrhart v. King County*, 195 Wn.2d 388, 409, 460 P.3d 612 (2020) (quoting *Dowler v. Clover Park Sch. Dist. No. 400*, 172 Wn.2d 471, 485, 258 P.3d 676 (2011)). The facts and all reasonable inferences drawn therefrom are viewed in the light most favorable to the nonmoving party. *Lakey*, 176 Wn.2d at 922.

The Osborns argue throughout their brief that our task on review is to determine whether substantial evidence supports the trial court's findings on each element of adverse possession. They are mistaken. The Pokornys appeal from summary judgment, and de novo is the appropriate standard of review. *See id.*

## II. SUBJECT MATTER JURISDICTION

The Pokornys claim that the superior court lacked subject matter jurisdiction to alter the property boundaries between Lots 54 and 55 because the designated legislative body within the city of Ocean Shores has exclusive authority to amend plats under RCW 58.17.215. The Pokornys assert that under this statute, the Osborns were required to first exhaust administrative remedies by seeking to amend the plat by submitting a request to the city or to Grays Harbor County prior to raising their adverse possession counterclaim before the superior court.

The Osborns respond that the superior court had original jurisdiction over this action because the claims raised involved title to and possession of real property. The Osborns contend that the superior court does not gain or lose subject matter jurisdiction over a claim based on the action or inaction of a party. The Osborns further counter that they were not required to submit an application to amend the subdivision from the city prior to raising their adverse possession counterclaim because RCW 58.17.215 does not apply to this case and because no court has ever imposed such a requirement on a party seeking to quiet title through adverse possession.

The Pokornys characterize their argument as a challenge to the superior court's subject matter jurisdiction to decide the Osborns' adverse possession claim. However, the Pokornys' contention is actually a challenge to the superior court's authority to enter a particular order. We disagree with the Pokornys; RCW 58.17.215 did not divest the superior court of authority to quiet title to the disputed strip in the Osborns because that statute does not apply to this case.

A. LEGAL PRINCIPLES

A court must have subject matter jurisdiction to decide a case. *In re Estate of Reugh*, 10 Wn. App. 2d 20, 43, 447 P.3d 554 (2019), *review denied*, 194 Wn.2d 1018 (2020). An order

entered by a court that lacks subject matter jurisdiction is void. *Angelo Property Co., LP v. Hafiz*, 167 Wn. App. 789, 808, 274 P.3d 1075 (2012). Lack of subject matter jurisdiction may be asserted for the first time at any point in the proceedings, including on appeal. *In re Marriage of McDermott*, 175 Wn. App. 467, 479, 307 P.3d 717 (2013).

A court's authority or power to rule in a certain way is a distinct issue from whether a court has subject matter jurisdiction. *In re Marriage of Buecking*, 179 Wn.2d 438, 447-48, 316 P.3d 999 (2013). The Supreme Court has clarified that "[s]ubject matter jurisdiction refers to a court's ability to entertain a type of case, not to its authority to enter an order in a particular case." *Id.* at 448. If the court has subject matter jurisdiction to address the type of case, "'then all other defects or errors go to something other than subject matter jurisdiction.'" *ZDI Gaming, Inc. v. Wash. State Gambling Comm'n*, 173 Wn.2d 608, 618, 268 P.3d 929 (2012) (internal quotation marks omitted) (quoting *Marley v. Dep't of Labor & Indus.*, 125 Wn.2d 533, 539, 886 P.2d 189 (1994)).

B. THE SUPERIOR COURT HAD SUBJECT MATTER JURISDICTION TO ADDRESS ADVERSE POSSESSION

Here, the matter before the superior court primarily involved the Pokornys' and the Osborns' competing assertions of title to a disputed strip of real property. Under article IV, section 6, the Washington Constitution explicitly sets forth the superior court's original jurisdiction "in all cases at law which involve the title or possession of real property." The Osborns' adverse possession claim, as part of the broader property dispute between the neighbors, is a type of controversy that falls squarely within the superior court's original jurisdiction as set forth by the Washington Constitution. Const. art. IV, § 6.

Notably, the Pokornys do not claim that the superior court lacks subject matter jurisdiction to decide adverse possession claims or boundary disputes as a general matter. Instead, they argue

that the superior court here did not have jurisdiction to rule in favor of the Osborns on their adverse possession claim because in so doing, the superior court altered the boundary lines in their subdivision contrary to RCW 58.17.215, which requires an individual seeking to alter a subdivision to first submit an application to a legislative authority.

The Pokornys' assertion that the superior court lacked jurisdiction depends on the trial court ultimately ruling in favor of the Osborns on their adverse possession claim. Had the trial court determined instead that the Osborns did not acquire title to the disputed strip through adverse possession, then the boundary lines would not have been altered and the Pokornys' subject matter jurisdiction claim is defeated. Consequently, although the Pokornys frame their contention as a matter of the superior court's subject matter jurisdiction, the issue is properly construed as whether RCW 58.17.215 divests the superior court of authority to amend a boundary line in a subdivision where the party seeking to amend the boundary did not first submit an application to the appropriate legislative authority.

C. THE SUPERIOR COURT HAD AUTHORITY TO AMEND THE BOUNDARY LINE BETWEEN THE OSBORN AND POKORNY PROPERTIES

RCW 58.17.215 does not apply to this case and, therefore, does not divest the superior court of authority to decide the adverse possession claim because the adverse possession claim involved a boundary line adjustment between two platted lots and did not result in the creation of additional lots. RCW 58.17.215 provides in pertinent part,

> When any person is interested in the alteration of any subdivision or the altering of any portion thereof, except as provided in RCW 58.17.040(6), that person shall submit an application to request the alteration to the legislative authority of the city, town, or county where the subdivision is located.

Under RCW 58.17.215, an application to the legislative authority is not required if the alteration involves,

> [a] division made for the purpose of alteration by adjusting boundary lines, between platted or unplatted lots or both, which does not create any additional lot, tract, parcel, site, or division nor create any lot, tract, parcel, site, or division which contains insufficient area and dimension to meet minimum requirements for width and area for a building site;

RCW 58.17.040(6).

The Pokornys rely on RCW 58.17.215 to assert that the superior court did not have authority to amend the boundary between Lots 54 and 55. The Pokornys contend that the RCW 58.17.040(6) exception incorporated into RCW 58.17.215 does not "authorize[] a Washington court to do anything," and that therefore it does not render the procedural prerequisite in RCW 58.17.215 inapplicable. Appellants' Reply Br. at 11. This contention is without merit.

RCW 58.17.040(6) is an exception to the application submission requirement described in RCW 58.17.215. It follows that if the exception described by RCW 58.17.040(6) applies to the subdivision alteration in this case, the Osborns were under no obligation to first apply to the local legislative authority prior to raising their adverse possession claim. The exception to this statute need not separately grant the superior court authority to alter boundary lines.

RCW 58.17.040(6) applies. In adjusting the boundary between Lots 54 and 55, two platted lots, the superior court did not create any additional lots or tracts. Therefore, the Osborns were not required to seek approval from a legislative authority for this type of alteration. *See* RCW 58.17.215; RCW 58.17.040(6).

The superior court had subject matter jurisdiction to address the Osborns' adverse possession claim and the authority to resolve the adverse possession claim in the Osborns' favor.

III. ADVERSE POSSESSION

A. LEGAL PRINCIPLES

Under the doctrine of adverse possession, a person may acquire legal title to another's land if they use the land for at least 10 years in a manner that is (1) hostile, (2) actual and uninterrupted, (3) open and notorious, and (3) exclusive. *Gorman v. City of Woodinville*, 175 Wn.2d 68, 71, 283 P.3d 1082 (2012) (quoting *ITT Rayonier, Inc. v. Bell*, 112 Wn.2d 754, 757, 774 P.2d 6 (1989)). To satisfy the 10-year requirement, the party claiming adverse possession may rely on the use of a predecessor in interest. *Acord v. Pettit*, 174 Wn. App. 95, 103, 302 P.3d 1265 (2013). The burden of proving each element of adverse possession falls on the claimant. *Maier v. Giske*, 154 Wn. App. 6, 18, 223 P.3d 1265 (2010).

Once the elements of adverse possession have been satisfied for 10 years, title to the property vests automatically in the adverse possessor. *Gorman*, 175 Wn.2d at 72. There is no need to file a quiet title action in recognition of this fact. *Id.* at 74. The adverse possessor is not required to quiet title to the property in order to convey the interest they have acquired through adverse possession. *Nickell v. Southview Homeowners Ass'n*, 167 Wn. App. 42, 51, 271 P.3d 973 (2012).

B. ANALYSIS

The Pokornys claim that the trial court erred in granting summary judgment in favor of the Osborns because genuine issues of material fact exist as to several of the elements of adverse possession. In particular, the Pokornys argue that the Osborns' use and their predecessors' use was not hostile, actual and uninterrupted, or notorious for the statutory period. The Pokornys do not

address whether there are genuine issues of material fact as to the exclusive use element of adverse possession.[5]

The Osborns contend that title to the disputed strip vested in Walter sometime in the year 2000. The Osborns argue that Walter's use of the strip was hostile, actual and uninterrupted, exclusive, and open and notorious.

We agree with the Osborns that there are no genuine issues of material fact and that the Osborns are entitled to summary judgment as a matter of law on their adverse possession claim. Title vested in Walter approximately 10 years after he purchased the property because his use of the disputed strip satisfied each element of adverse possession.

1. HOSTILE USE

a. Legal Principles

To establish hostile use, the adverse claimant must "'treat the land as his own as against the world, throughout the statutory period.'" *Ofuasia v. Smurr*, 198 Wn. App. 133, 144, 392 P.3d 1148 (2017) (internal quotation marks omitted) (quoting *Nickell*, 167 Wn. App. at 50). The claimant's subjective belief regarding his or her interest in the land is inconsequential; the claimant's treatment of the land is the only relevant consideration. *Maier*, 154 Wn. App. at 19.

If a claimant receives either express or implied permission from the true owner to use the property, hostile use cannot be established because "permissive use is inconsistent with making

---

[5] In their reply brief, the Pokornys reassert prior arguments regarding notorious and hostile use in response to the Osborns' statement that the Pokornys did not challenge the trial court's finding regarding exclusive use. However, because the standard of review is de novo, regardless of the Pokornys' failure to address the element, we must determine whether a genuine issue of material fact exists as to this element as well. *See Lakey*, 176 Wn.2d at 922.

use of property as would a true owner." *Teel v. Stading*, 155 Wn. App. 390, 394, 228 P.3d 1293 (2010). Permissive use may be inferred "when it is reasonable to assume 'that the use was permitted by sufferance and acquiescence.'" *Miller v. Anderson*, 91 Wn. App. 822, 828, 964 P.2d 365 (1998) (quoting *Granston v. Callahan*, 52 Wn. App. 288, 293, 759 P.2d 462 (1988)).

b. Analysis

Walter maintained the property up to the perceived boundary line in a manner sufficient to establish hostile use for the statutory period. We have previously held that an adverse claimant established hostile use where the claimant, "cleared away brush and wild shrubbery," and "landscaped, mowed, and maintained the area continuously." *Lingvall v. Bartmess*, 97 Wn. App. 245, 254, 982 P.2d 690 (1999). Although planting trees without maintaining them might not be sufficient evidence of hostile use, *Anderson v. Hudak*, 80 Wn. App. 398, 404, 907 P.2d 305 (1995), planting trees, mowing, and maintaining the area around the trees is sufficient. *Lingvall*, 97 Wn. App. at 254.

Here, in Walter's 16 years residing on Lot 54 with his family, he regularly mowed the lawn and pruned the trees along the so-called adverse possession line depicted in the photograph. Walter made physical changes to the disputed area by pouring the concrete pad in 1996 and by laying the lines of rocks to better enable his vehicles to reach the back yard of the property. Walter also continuously used the area as a place to store his landscaping materials. Shortly after purchasing the lot, Walter erected the driftwood barrier along the boundary line that grew in size over several seasons as he collected more driftwood. Although the driftwood barrier consisted of less than 20 pieces, did not enclose the yard, was intended as a barrier for wildlife rather than humans, and did

not extend down the entire boundary line, its construction nevertheless reflects treatment of land consistent with that of a true owner. *See Ofuasia*, *198* Wn. App. at 144.

In addition, when Moors and Green began developing Lot 55 in 2003, Walter was still residing on Lot 54. Moors recalled seeing rock tracks that looked like a driveway in the disputed strip as well as Walter's truck parked in the backyard. Moors testified that he had assumed, while he was developing the property, that the boundary between Lots 54 and 55 was along the adverse possession line as depicted in the photograph in Part I, *supra*, at 5.

Woodbeck purchased Lot 55 in 2005, while Walter still resided on the Lot 54. She also identified the adverse possession line as what she believed was the boundary between the two lots. She testified that if she had hypothetically wanted to cut vegetation in the area west of the adverse possession line, she would have had to obtain permission from the owner of Lot 54. Finally, shortly after purchasing the property, when Woodbeck asked Moors and Green to construct a garage and studio attachment, Woodbeck ensured that the location of the addition met the five-foot boundary line setback requirement. She measured the distance for the addition against the adverse possession line. Taken together, these undisputed facts establish hostile use.

The Pokornys contend that these facts are insufficient to establish hostile use and that a genuine dispute of material fact remains as to the hostile use element because (1) none of the owners of Lot 54 used the strip in a manner that would overcome presumptions of permissive use, and (2) the Osborns made statements that either recognized the Pokornys' superior title to the strip or alternatively, that raised an issue of credibility, precluding summary judgment. We disagree.

*i. Presumptions of Permissive Use*

The Pokornys contend that summary judgment was improper because the trial court failed to address applicable presumptions that the Osborns were required to overcome in order to establish hostile use. But the "presumptions" on which the Pokornys rely do not apply to this case.

For instance, the Pokornys rely on *Scheller v. Pierce County*, to argue that there is a freestanding presumption that an adverse claimant's possession of disputed property is subordinate to that of the true owner "'until a distinct and positive assertion of a right hostile to the owner, and brought home to him'" transforms a "'friendly holding into one of an opposite nature.'" Br. of Appellants at 32 (quoting 55 Wash. 298, 301-02, 104 P. 277 (1909)).[6] The Pokornys' assertion is incorrect to the extent that it implies that in order to establish hostile use, an adverse claimant is required to evince a subjective intent to dispossess the true owner of the property. The Supreme Court has expressly rejected this requirement and held that the only relevant consideration in determining hostility in an adverse possession claim is whether the claimant "treat[s] the land as his own as against the world." *Chaplin v. Sanders*, 100 Wn.2d 853, 860-61, 676 P.2d 431 (1984). Any traditional presumptions inconsistent with this description of hostile use no longer apply. *Id.* at 861.

The Pokornys also claim that when land is open and vacant, use of that land is presumed permissive and the adverse claimant has a higher burden of proving otherwise. They argue that because Lot 55 was vacant until September 2005, the presumption of permissive use was operative

---

[6] *Scheller* is also inapposite because the claimant in that case sought to convert a license, which was an express initial permissive use, into a prescriptive easement. 55 Wash. at 301-02. The language the Pokornys excerpt in their brief refers to the claimants' burden of proving that the permissive use terminated and has become adverse.

until that time. The Pokornys are correct in that in the context of prescriptive easements, in some circumstances, including where land is "'vacant, open, unenclosed, [and] unimproved,'" a claimant must overcome a presumption of permissive use. *Nickell*, 167 Wn. App. at 52 (quoting *Nw. Cities Gas Co. v. W. Fuel Co.*, 13 Wn.2d 75, 83, 123 P.2d 771 (1942)). However, the Pokornys have not identified any adverse possession cases wherein the court applied this presumption. In *Nickell*, we declined to apply the presumption to an adverse possession claim in part because the land at issue was in a "medium-intensity residential environment," and also because "although the law disfavors prescriptive easements, no such disfavor applies to adverse possession of actual land." 167 Wn. App. at 52.

Finally, the Pokornys identify a presumption of permissive use that arises "when it is reasonable to assume 'that the use was permitted by sufferance and acquiescence.'" *Miller*, 91 Wn. App. at 828 (quoting *Granston v. Callahan*, 52 Wn. App. 288, 294, 759 P.2d 462 (1988)). The Pokornys do not describe any facts that lead to a reasonable inference of neighborly sufferance and acquiescence, but they nevertheless claim that this presumption applies to this case and that the Osborns have failed to overcome it. In addition, this presumption applies to "enclosed or developed land cases" involving prescriptive easements. *Gamboa v. Clark*, 183 Wn.2d 38, 44, 348 P.3d 1214 (2015). As the Pokornys recognize, Moors and Green did not begin to develop Lot 55 until 2003, and the Lot was vacant until 2005. The presumption of neighborly sufferance and acquiescence could not apply until that time. *See id.* And this case involves a claim of adverse possession, not a prescriptive easement. Because the title vested as to the disputed strip during Walter's ownership of Lot 54, several years before Moors and Green began developing the

adjoining lot, and this case involves a claim of adverse possession, this presumption does not apply.

### ii. The Obsorns' Statements

The Pokornys argue that the Osborns made several comments, including (1) stating that the "'[o]ld [f]ence'" belonged to Woodbeck in an email, (2) seeking "permission" from the Pokornys to trim the trees in the disputed area to eight feet, (3) asking the Pokornys for permission to allow their painters to cross the disputed area, and (4) offering to purchase the disputed strip, that negate hostile use because they can be interpreted as recognizing superior title to the property in the Pokornys. Br. of Appellants at 34. Alternatively, the Pokornys claim the latter three statements at least raise an issue of credibility that cannot be resolved in summary judgement. We disagree with both arguments.

Because title to the disputed strip vested automatically in Walter on expiration of the 10-year period, and his interest to the strip was conveyed to subsequent owners, statements that the Osborns made approximately 15 years later are irrelevant and do not undermine evidence of Walter's hostile use. *See Gorman*, 175 Wn.2d at 72, 74. The Pokornys' credibility claim fails for the same reason. Because title vested in Walter sometime in the year 2000, whether the Osborns made statements that could be interpreted as indicating that they did not own the disputed strip

many years later is not material to the issue of Walter's hostile use. *See Laguna v. Wash. State Dep't of Transp.*, 146 Wn. App. 260, 266, 192 P.3d 374 (2008).[7]

2. ACTUAL AND UNINTERRUPTED

a. Legal Principles

To acquire title to property by adverse possession, the claimant must have actual and uninterrupted possession of the disputed property for the statutory period. *Ofuasia*, 198 Wn. App. at 143. "To interrupt adverse possession, there must be actual cessation of the possession." *Id.* at 144. Once title has been acquired by an adverse possessor upon expiration of the 10-year period, there is no need for a subsequent title holder to perfect the interest in a quiet title action, and the interest is automatically conveyed. *Gorman*, 175 Wn.2d at 74.

If, however, the statutory period has not expired, a claimant may "tack" his or her use to that of a predecessor in interest provided that there is a "reasonable connection between the successive occupants that will raise their claim of right above the status of wrongdoer or trespasser." *Ofuasia*, 198 Wn. App. at 144. "Where there is privity between successive occupants holding continuously and adversely to the true title holder, the successive periods of occupation may be tacked to each other to compute the required 10–year period of adverse holding." *Roy v. Cunningham*, 46 Wn. App. 409, 413, 731 P.2d 526 (1986).

---

[7]The Pokornys' claim that the Osborns' statements demonstrate that the Osborns recognized the Pokornys' superior title to the strip, defeating the hostile use element of adverse possession, is without merit. The Osborns never claimed that they, as opposed to the Pokornys, owned the old fence. Disclaiming ownership of the old fence is distinct from recognizing the Pokornys' title to the strip of property west of the old fence. In addition, the remaining statements were made after the tree cutting incident either in an effort to settle the dispute or to maintain the status quo while the dispute regarding the strip was adjudicated.

b. Analysis

The Pokornys claim that the Osborns have failed to establish continuous possession of the strip because Walter "abandon[ed]" the property 203 days before he sold it to Millard, and Millard vacated the property for 68 days before it was sold to the Osborns. Br. of Appellants at 35. The Pokornys assert that these breaks in occupancy constitute actual cessation of possession interrupting the statutory period. The Pokornys claim that at minimum, the issue of whether these breaks are significant enough to interrupt possession should be submitted to the finder of fact.

The Osborns contend that because title automatically vested in Walter, and there is no dispute that he had actual and uninterrupted possession of the property between 1990 and 2006, this element of adverse possession is satisfied. In the alternative, the Osborns claim the periods of vacancy between selling the property do not constitute cessation of possession.

Because Walter lived on the property for longer than 10 years, his use of the strip during this time was actual and uninterrupted. Shortly after Walter purchased Lot 54, he attempted to uncover the boundary between his Lot and Lot 55. Since that time, Walter assumed that the boundary line ran between his back corner monument and the utility pedestal. Walter's use of the property up to that boundary line was consistent for the 16 years he lived on Lot 54. There is no evidence that Walter's possession was interrupted. The Pokornys' contention regarding the periods during which the property was unoccupied between Walter's sale of the property to Millard, and Millard's sale of the property to the Osborns is therefore immaterial and does not create a triable issue of fact.

3. OPEN AND NOTORIOUS USE

a. Legal Principles

To establish the open and notorious use element of adverse possession, the evidence must demonstrate "use consistent with ownership." *Acord*, 174 Wn. App. at 104. That is, use and occupancy of the disputed property must "be like that of a true owner, considering the land's nature and location." *Id.* A claimant can satisfy the open and notorious element by showing either that the title owner had actual notice of the adverse use throughout the 10-year period or that the claimant used the land such that any reasonable person would have thought they owned it. *Ofuasia*, 198 Wn. App. at 143-44.

In *Riley v. Andres*, we held that the use of a disputed strip of land was open and notorious where the adverse claimants planted flowers, maintained the landscaping by watering and pruning plants, spreading beauty bark, and pulling weeds, and that those uses were typical for the land's nature and location. 107 Wn. App. 391, 397, 27 P.3d 618 (2001). In *Acord*, the court concluded that the adverse claimants' actions in cutting trees and firewood were "consistent with the character and nature of the property" as forested property, demonstrating open and notorious use. 174 Wn. App. at 109.

b. Analysis

The Pokornys argue that genuine issues of material fact persist as to the open and notorious use element of adverse possession because the disputed strip was actually on Lot 55, which was vacant. Thus, they assert that more evidence of open and notorious use is required than the "[o]ld [f]ence," the concrete pad, the rocks in the driveway, and Walter's storage of landscaping materials on the disputed strip. Br. of Appellants at 39. The Osborns respond that every owner used the

disputed strip like a true owner, considering the land's nature and location, thereby demonstrating open and notorious use. We agree with the Osborns that Walter's use was open and notorious for the statutory period.

Relying on *Hunt v. Matthews*, the Pokornys assert that "[g]reater use of a vacant lot would be required to be notorious to an absentee owner than to one occupying the land who would observe an offensive encroachment daily." Br. of Appellants at 38 (quoting 8 Wn. App. 233, 237, 505 P.2d 819 (1973) (overruled on other grounds by *Chaplin*, 100 Wn.2d at 861)). There, the court held that to demonstrate open and notorious use of a lot, a claimant's use "must be made with sufficient obtrusiveness to be unmistakable to an adversary, not carried out with such silent civility that no one will pay attention." *Hunt*, 8 Wn. App. at 236.

The Pokornys claim that Walter's use does not satisfy the standard set forth in *Hunt* because there is no evidence that anyone ever saw the landscaping materials he stored on his property, and pruning vegetation and installing rocks and boulders that disappear into the sand likewise does not warn the true owner of a potentially offensive encroachment. However, the fact that there is no evidence that someone actually saw Walter's landscaping materials stored along the boundary does not negate the fact that had someone seen the material, it would have been sufficiently obtrusive so as to establish open and notorious use. *See id.* Moreover, beyond maintaining the landscape, mowing the area up to the boundary line, and placing rocks, Walter also poured a concrete pad which permanently altered the landscape, and he erected a partial barrier of driftwood along the boundary line. Considered individually these actions might not be sufficient to establish open and notorious use of vacant land, but taken together, they go beyond acts "carried out with such silent civility that no one will pay attention." *See id.*

The Pokornys argue that the trial court erred in relying on the old fence as evidence of open and notorious use because the fence was dilapidated, and it did not enclose the property. However, the trial court did not actually rely on the old fence as evidence of open and notorious use. Instead, the trial court's discussion of the fence in its ruling was limited to describing the fence as a common reference point marking the boundary between Lots 54 and 55. Even if the trial court relied on evidence regarding the old fence, we are not bound by the trial court's reasoning on review of an order granting summary judgment. *Lakey*, 176 Wn.2d at 922.

There is no genuine dispute of material fact regarding Walter's open and notorious use of the disputed strip. His use and occupancy of the disputed property was consistent with that of a "true owner, considering the land's nature and location." *Acord*, 174 Wn. App. at 104. Walter used the land in a manner such that any reasonable person would have thought that he owned it. *Ofuasia*, 198 Wn. App. at 143-44.

4. EXCLUSIVE POSSESSION

a. Legal Principles

Exclusive possession is established when the claimant possesses the disputed property as an owner would. *Crites v. Koch*, 49 Wn. App. 171, 174, 741 P.2d 1005 (1987). Possession need not be "absolutely exclusive," but it must "be of a type that would be expected of an owner under the circumstances." *Id.* Important considerations include, "what use an owner would make," which is informed by "the nature and location of the land." *Id.*

b. Analysis

The Pokornys do not address this element of adverse possession. But the Osborns argue that other than the Pokornys, none of the owners of Lot 55 ever challenged Walter's, Millard's, or

the Osborns' possession of the disputed strip. The Osborns claim that the record does not demonstrate any evidence that someone other than the Osborns or their predecessors in interest used the disputed property.

The Osborns' and their predecessors' use of the disputed strip was exclusive. Aside from Mr. Pokorny's deposition testimony wherein he stated that when he first purchased Lot 55, he spent approximately two weekends cleaning out debris from the trees and salal between the lots left by Woodbeck's renter, and that he occasionally retrieved branches that fell from the evergreen in his yard onto the Osborns' side of the perceived boundary line, there is no evidence that any other individual used the disputed property. There is also no evidence in the record that someone other than Walter used the disputed strip during the statutory period in which title to the strip vested in Walter. For that 10-year period, undisputed facts demonstrate that Walter possessed the property in a manner expected of an owner under the circumstances. *See id.*

There is no genuine dispute of material fact as to any of the elements of adverse possession. Title to the strip vested in Walter and was conveyed to his successors in interest. The Osborns are entitled to summary judgment on their adverse possession claim.

## IV. BOUNDARY LINE DETERMINATION

### A. LEGAL PRINCIPLES

To determine where a boundary line exists when deciding an adverse possession claim, "[t]he court need not find a 'blazed or manicured trail' establishing the disputed boundary; rather, the court may project a line between objects where it is reasonable and logical and the claimant's use of the land was open and notorious." *Riley*, 107 Wn. App. at 396 (quoting *Lloyd v. Montecucco*, 83 Wn. App. 846, 853–54, 924 P.2d 927 (1996)). The court also need not determine the precise

square yard possessed by the adverse claimant in order to establish a boundary, but it may instead "create a penumbra of ground around areas actually possessed when reasonably necessary to carry out the objective of settling boundary disputes." *Lloyd*, 83 Wn. App. at 853-54.

## B. ANALYSIS

The Pokornys contest the trial court's decision to set the boundary on the line extending from the rear corner monument, through the position of the old fence, through the trees, salal, and other vegetation, down to the street in front of the property. They assert that the trial court improperly relied on the old fence when determining the location of the boundary line because there was no mutual agreement between the parties establishing the fence as the boundary, the fence did not exclude the abutting owner, and most importantly, there was "profound confusion among the witnesses as to what fence existed or when it existed." Br. of Appellants at 44. In addition, the Pokornys argue that the trial court erred when it extended the boundary line through the trees and salal in a straight line from the Osborns' fence down to the street because including this area is not reasonably necessary to settle the boundary dispute.

The Osborns respond that the trial court's determination of the boundary line was proper because it was consistent with the impression of every prior owner of Lot 54 or Lot 55 and with the nature and character of the adverse use. We agree. The trial court did not err in locating the boundary line using the old fence line as a marker and extending the line to its logical end at the street.

The Pokornys rely on *Thomas v. Harlan*, 27 Wn.2d 512, 178 P.2d 965 (1947), to assert that in order to establish the old fence as a boundary line, the Osborns were required to demonstrate an agreement with the Pokornys that this fence represented a boundary between their lots. However,

*Thomas* involved a boundary dispute where the parties asserted that a fence represented a boundary line on the basis of mutual recognition and acquiescence. 27 Wn.2d at 519. To establish a boundary on a theory of mutual recognition and acquiescence, an agreement as to the boundary is required. *Id.* But here, the boundary dispute was resolved under a theory of adverse possession and no such agreement is necessary.

The Pokornys further claim that a fence cannot establish a boundary unless it is effective in excluding the abutting owner, relying on *Wood v. Nelson*, 57 Wn.2d 539, 541, 358 P.2d 312 (1961). This inquiry is relevant for determining when the existence of a fence constitutes prima facie evidence of hostile possession up to that fence. *Id.* But this rule does not preclude a trial court from using a fence as a boundary marker where adverse possession has been established up to that fence by other facts. The trial court here used the old fence as a boundary marker rather than as evidence of hostile use.

Finally, the Pokornys contend that the fence cannot be used to establish a boundary between the lots because unresolved questions remain regarding what the fence consisted of, when the fence was built, and who constructed the fence. However, a court may delineate a boundary between objects where it is reasonable and logical, and the claimant's use of the land was open and notorious. *Riley*, 107 Wn. App. at 396. Open and notorious use of the land going up to the fence was established on other facts as discussed above. In addition, it is undisputed that Walter, Millard, the Osborns, Moors, Woodbeck, and the Pokornys each recognized that the fence existed, testified to its location, and described their impression (at least initially) that this fence represented the boundary to the lots. The fence, therefore, represents a "reasonable and logical" marker for the purpose of illustrating the boundary between the lots.

The Pokornys separately assert that, even if they accept the fence as a boundary marker, there is no "reasonable explanation" for extending the adverse possession line from the end of the fence, all the way through the middle of the trees and salal, down to the street. Br. of Appellants at 45. The Pokornys would have the trial court terminate the boundary line where the old fence ends and quiet title to the Pokornys in the remaining portion of the disputed strip as designated by the survey. However, courts are entitled to delineate a boundary as is reasonably necessary to settle boundary disputes. *Lloyd*, 83 Wn. App. at 853. A court may project a straight line between objects and avoid a jagged boundary. *Id.* at 853-54. The Pokornys' construction would result in a jagged line that prevents the Osborns from accessing and making use of the property they acquired title to through adverse possession. Consequently, the trial court did not err in following the long-accepted boundary between the two lots to establish the adverse possession line.

## V. DENIAL OF THE MOTION FOR RECONSIDERATION

### A. LEGAL PRINCIPLES

A trial court's decision on a motion for reconsideration will only be reversed if the trial court abused its discretion. *Rivers v. Wash. State Conf. of Mason Contractors*, 145 Wn.2d 674, 685, 41 P.3d 1175 (2002). "'A [trial] court abuses its discretion when its decision is manifestly unreasonable, or exercised on untenable grounds or for untenable reasons,' namely, when the court 'relies on unsupported facts, takes a view that no reasonable person would take, applies the wrong legal standard, or bases its ruling on an erroneous view of the law.'" *Kelley v. Centennial Contractors Enterprises, Inc.* 169 Wn.2d 381, 386, 236 P.3d 197 (2010) (alteration in original) (quoting *Gildon v. Simon Prop. Grp., Inc.*, 158 Wn.2d 483, 494, 145 P.3d 1196 (2006)).

B. ANALYSIS

The Pokornys argue that the trial court abused its discretion when it denied their motion for reconsideration because it failed to consider applicable law regarding presumptions of permissive use that applied to the Osborns' adverse possession claim. The Pokornys assert that this alleged failure constitutes an erroneous view of the law. In effect, the Pokornys reassert claims raised in their argument pertaining to the hostile use element of adverse possession.

We disagree, because as discussed above, the presumptions of permissive use do not apply to this case. Moreover, the Pokornys do not provide any evidence that the trial court declined to consider the presumptions.

VI. DISMISSAL OF THE POKORNYS' CLAIMS

The Pokornys argue that because the trial court erred in granting the Osborns' motion for summary judgment, the trial court likewise erred in dismissing their remaining claims on that basis. We disagree because the trial court did not err in granting summary judgment in favor of the Osborns. As explained above, dismissal of the Pokornys' claims, which were all predicated on a claim of title to the strip and the trees and shrubs that grew on the strip, was proper.

VII. ATTORNEY FEES BELOW

The Pokornys ask that we reverse the trial court's order awarding attorney fees to the Osborns. They assert that because the Osborns are not entitled to summary judgment, they are not the prevailing party below and they are not entitled to attorney fees pursuant to RCW 7.28.083(3). Because the trial court did not err in granting the Osborns' motion, the trial court likewise did not err in awarding attorney fees.

VIII. ATTORNEY FEES ON APPEAL

Both parties request attorney fees on appeal. In an action asserting title to real property by adverse possession, RCW 7.28.083(3) authorizes an appellate court to award costs and reasonable attorney fees to the prevailing party "if, after considering all the facts, the court determines such an award is equitable and just." *See also Workman v. Klinkenberg*, 6 Wn. App. 2d 291, 308-09, 430 P.3d 716 (2018).

It is equitable and just in this case to award the Osborns attorney fees on appeal as the prevailing party. The Osborns did not initiate the lawsuit but raised adverse possession as a counterclaim in their defense, and the Osborns have successfully defended the trial court's order granting summary judgment on that claim. We award the Osborns attorney fees associated with this appeal in an amount to be determined by a commissioner of this court.

CONCLUSION

We hold that the trial court had subject matter jurisdiction to address the Osborns' adverse possession claim, as well as authority to resolve the claim in their favor. We further hold that the Osborns are entitled to summary judgment because there are no genuine disputes of material fact as to any of the elements of adverse possession. We also hold that the trial court properly determined the boundary between the two lots based on the position of the old fence and other evidence. Finally, the trial court did not err in its order on the motion for reconsideration, order on

dismissal of the Pokornys' claim, and order awarding attorney fees. We award the Osborns their reasonable attorney fees on appeal.

Accordingly, we affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

CRUSER, J.

We concur:

LEE, C.J.

GLASGOW, J.